789 A.2d 149 (2002)
347 N.J. Super. 180
SOLID ROCK BAPTIST CHURCH, a non-profit religious organization incorporated under the laws of the State of New Jersey, Plaintiff-Appellant,
v.
Rudy V. CARLTON, Defendant-Respondent.
Congregation of Solid Rock Baptist Church, Plaintiffs/Intervenors-Respondents,
v.
Solid Rock Baptist Church, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 2002.
Decided January 31, 2002.
*150 Robert L. Martin, Denville and Cyril S. Hodge, East Orange, argued the cause for appellant (Mr. Martin, Mr. Hodge and Bernard Weiss, on the brief).
Peter W. Till, Springfield, argued the cause for respondent Congregation of Solid Rock Baptist Church (Mr. Till and Clifford Minor, on the joint brief).
Before Judges PRESSLER, CIANCIA and PARRILLO.
The opinion of the court was delivered by PARRILLO, J.A.D.
This case involves an intrachurch dispute over eligibility for nomination to elective office in a religious organization. The intrafaith conflict is actually rooted in a deeper doctrinal schism leading to a challenge by a breakaway congregational faction for control of church governance and administration. Plaintiff Solid Rock Baptist Church (Solid Rock) appeals the "eligibility" determination of the chancery courtallowing floor nominations without preliminary recommendations from and prequalification by the nominating committeeas violative of church process and procedure and as an unwarranted judicial intrusion into matters of church doctrine and polity. By democratizing the nominating process, plaintiff contends the court below fundamentally and impermissibly reordered church structure, transforming *151 a congregational church with an internal governing body into a church entirely controlled by its membership. Defendant Rudy Carlton, the ousted pastor "recalled" as a result of the court-monitored elections, and his intervenor-supporters counter that the chancery judge properly enforced the clear and express terms of church by-laws that, they claim, provide for floor nominations without pre-screening and prequalification by the nominating committee.
The essential facts are not in dispute. Solid Rock was incorporated in 1980 as a religious corporation pursuant to N.J.S.A. 16:1-1 to -47. In 1981, it purchased property in Irvington upon which its church is located and from where services are conducted.
Solid Rock, like other Baptist churches, is congregational. See Baugh v. Thomas, 56 N.J. 203, 265 A.2d 675 (1970); Moorman v. Goodman, 59 N.J.Super. 181, 157 A.2d 519 (App.Div.1960). Unlike hierarchical churches wherein the local church is "an integral and subordinate part of the general church and subject to its authority," Protestant Episcopal Church v. Graves, 83 N.J. 572, 577, 417 A.2d 19 (1980), cert. denied sub nom. Moore v. Protestant Episcopal Church, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981), Solid Rock is a local autonomous body where church authority and control over church property rests completely in the local congregation and its elected officers. The present dispute focuses on the allocation of that authority as between the congregation's membership and its elected officials.
The constitution of Solid Rock, consistent with congregational organizations, vests governing power in "its own sovereign body ... independent of any governmental, legislative laws, executive and judicial courts." In addition, Solid Rock enacted by-laws that detail, among other things, church governance and administration. Thus, Article VI establishes three bodies to govern the affairs of the church: an executive board, a board of trustees, and a board of deacons. The executive board consists of the pastor, the board of trustees, and the board of deacons; it meets monthly and discusses all matters of the church, spiritual and financial. The trustee board consists of nine to eleven members elected annually and holds in trust all property belonging to the church, and designates the bank where the funds of the church shall be deposited. The deacon board assists the pastor in his spiritual work and consists of deacons appointed by a "free vote of the church, after recommendation by the pastor and deacons who possess the qualifications as recorded in Timothy 3:8-13." In addition, there is an advisory council, consisting of the elected officers of the church, the chairs of all standing committees, and the presidents of all auxiliary organizations. The council is authorized to review and amend all agenda items before presentation to the church. Other officers include a treasurer, a financial secretary, and a clerk.
Article IX of the by-laws provides that election of church officers is to be held during annual meetings of the church in the third week of November. Section 3 of Article IX, the provision at the center of the controversy, prescribes the process for nominating persons for church office. The advisory council appoints a nominating committee who prepares a list of members qualified to hold the various church offices, interviews the candidates to ascertain their willingness to serve, nominates one or more persons from the list for each office, and reports the nominees to the congregation. In addition, any member present at the annual meeting and qualified to vote *152 has the privilege of nominating "... any eligible person for any office not so nominated." (Emphasis added).[1] Article IX also prescribes voter qualifications and provides that election is by majority vote.
The pastor is an ex-officio member of all boards and committees of the church and its auxiliary organizations. According to Article VI, Section 2 of the by-laws, when there is a vacancy, the advisory council selects a representative pulpit committee of the executive board to take the necessary steps to hire a pastor. When a suitable person is found, the committee recommends that person to the congregation for consideration at a vote at a regularly called church business meeting. The pastor may be terminated for cause as stipulated in the contract, the church covenant, and the by-laws.
Carlton was hired as pastor on September 11, 1989, and entered into a Pastor Agreement obligating him to be cooperative, act in agreement with the deacons, remain in accord with the executive board, abide by the church constitution and bylaws, and espouse Baptist doctrines. He is the focal point of the present dispute over rightful occupancy of Solid Rock's pastorship. The genesis of the ecclesiastical conflict between Carlton and the executive board may be traced to 1994 when Carlton began efforts to implement a "full gospel" ministry at Solid Rock, a doctrinal teaching apparently at odds with church theology extant before his arrival on the scene. Despite the executive board's disapproval, in 1997 and 1998 Carlton took several steps to advance the full gospel ministry at Solid Rock, including bringing a full gospel bishop to the church to instruct the executive board on the ideology of full gospel, taking church members to a full gospel Baptist conference, petitioning the deacon board for spiritual and financial support for the full gospel ministry, and accepting the position of district overseer for Newark and its vicinity on behalf of the full gospel ministry.
Based on the recommendation of the deacon board, the executive board, on September 21, 1998, voted to call on Carlton to honor all aspects of his pastor agreement and, if he could not, to inform him that steps would be taken to remove him from office. In addition, the executive board voted to forbid Carlton from introducing any full gospel teachings at the church's worship services. Carlton, apparently, agreed to abide by these recommendations. However, at Sunday services on September 27, 1998, Carlton attacked the executive board and told the congregation that "I am going to do, what I have to do." On October 5, 1998, the executive board and the advisory council voted to terminate Carlton as pastor of Solid Rock.
Legal action ensued. On October 8, 1998, plaintiff filed a complaint and order to show cause (C-266-98) seeking to permanently enjoin Carlton from appearing on church property. The next day, October 9, 1998, the chancery judge denied preliminary injunctive relief because he was not convinced that all members of the advisory council were notified of the October *153 5, 1998 meeting at which Carlton was terminated. Consequently, plaintiff noticed all members of the executive board and advisory council of a special meeting on October 30, 1998, which was canceled when supporters of Carlton packed the church basement and refused to leave. The meeting to consider Carlton's removal was rescheduled for November 10, 1998 and was held on that date after the chancery judge's November 9, 1998 order that granted plaintiff's interim application for injunctive relief preventing interference with the meeting. At that meeting, in accordance with church procedure, the executive board and advisory council voted to terminate Carlton.
Evidently on account of the dissension, the executive board padlocked church doors and suspended church services. As a result, Carlton's supporters held an outdoor meeting on November 15, 1998, at which time they approved the following resolutions: that Carlton remain pastor of the church; that the church's executive board and advisory council be abolished; that the church's existing by-laws be abolished; and that a five-person committee, appointed by Carlton, prepare new bylaws.
Carlton's supporters also instituted legal action in the name of the "Congregation of Solid Rock Baptist Church." On November 17, 1998, they (intervenors) filed a verified complaint (C-313-98) and order to show cause seeking both prohibitory injunctive relief against plaintiff's interference with their control of, and access to, the church and mandatory injunctive relief that would compel plaintiff to deliver to them all business records of the church. They also moved to intervene in plaintiff's pending lawsuit (C-266-98). On December 21, 1998, the chancery judge ordered that, among other things, the padlocks be removed from the church; that Carlton not appear on church property and not participate in church services; and that the annual church meeting for 1998 be conducted in accordance with church bylaws no later than January 17, 1999.
On January 5, 1999, the chancery judge granted intervenors' motion to intervene, under R. 4:33-2, but denied their application for emergent relief to enjoin the executive and advisory boards because he found the vote at the November 15, 1998, meeting conducted outside the church to be improper. At that time, he also indicated an intent to appoint a monitor to oversee the election of church officers, to be conducted at the annual meeting. Significantly, for present purposes, the chancery judge interpreted Section 3 of Article IX of the by-laws as allowing floor nominations from the membership and, therefore, the executive board and advisory council did not have ecclesiastical authority to exclusively determine eligibility of nominees for church office.
Consistent with his stated intent, on January 8, 1999, the chancery judge appointed Jay Benenson, an attorney, as moderator to assist the court in resolving the underlying dispute between the parties, to supervise and oversee the annual meeting election, and to resolve issues of church membership, voter qualification, election notice, and voting procedures. Benenson's duties were set forth in the court's January 8, 1999 order:
The Moderator shall establish (a) the criteria for membership and the eligibility of members of the Church to participate and vote at the annual meeting; (b) the issue(s) to be presented at the meeting; (c) the voting procedure(s) at the meeting; (d) the ballot question(s) to be presented at that meeting; and (e) the form and manner of notice to be given; (f) any other related matters that will permit a fair and reasonable church *154 membership meeting to occur on the date to be set.
The moderator may conduct hearings, if he deems it appropriate, to resolve any and all questions related to the conduct and establishment of a fair and reasonable meeting as set forth herein and voting procedures and eligibility.
On March 25, 1999, Benenson designated seven members of the church to serve as the nominating committee and directed that the committee propose a slate of candidates for the following positions: board of trustees, treasurer, financial secretary, clerk, and superintendent of Sunday school. Consistent with the chancery judge's interpretation of Section 3, Article IX of the by-laws, Benenson invited all other members to file any other candidate slates, and intervenors timely filed a slate of nominees for church offices in support of Carlton, the terminated pastor. After determining voter qualifications, Benenson supervised the annual election meeting, held on April 29, 1999, at which Carlton's supporters prevailed, their slate having received 180 votes compared to the 153 votes cast for plaintiff's slate. As a result of the April 29, 1999 election, ecclesiastical control of Solid Rock passed from plaintiff's executive board to a board comprised of Carlton's supporters.
The election results were incorporated into the court's order of June 9, 1999 that also directed that a vote for pastor be taken no later than July 11, 1999. To this end, the chancery judge designated the entire executive board-consisting of the newly elected trustees and the deacon board, and controlled by the former-as the pulpit committee responsible for recommending to the Solid Rock congregation a pastor for consideration and vote.[2] On June 15, 1999, the pulpit committee voted to nominate and present Carlton as candidate for pastor. Interim applications by plaintiff to stay the election results of April 20, 1999 and the pastoral election scheduled for June 29, 1999 were denied. The vote for pastor was conducted on June 29, 1999 under Benenson's supervision. Carlton prevailed by a vote of 152 to 125.
The election results were accepted by the chancery judge in his order of June 26, 1999 that also vacated all restraints previously imposed on Carlton save for those regarding check writing privileges. The remaining financial restraints were also vacated by order of June 1, 2000. Plaintiff's amended complaint, seeking to permanently restrain Carlton from the property and to declare that plaintiff is entitled to church assets, was dismissed on intervenors' motion, pursuant to R. 4:6-2(e), by order of May 5, 2000. On May 23, 2000, the chancery judge entered a voluntary dismissal of intervenors' complaint against plaintiff.
Plaintiff appeals from a final judgment both adopting the results of church elections for officers and pastor, and dismissing its amended complaint for permanent injunctive relief against Carlton, its terminated pastor.[3] Plaintiff claims that the elections are void as contrary to church by-laws that vest ecclesiastical authority *155 to determine the eligibility of nominees for church office exclusively in internal church governing bodies.[4] By holding otherwisei.e., that nominations may be made by the membership without prequalification by the nominating committeethe chancery court, according to plaintiff, impermissibly intruded into matters of church governance, practice, and polity. Intervenors respond that the judge correctly interpreted church law to mean that the only rule is that the majority rules and that their faction represents the majority. For reasons that follow, we hold that, in the absence of clear and unambiguous direction in church law, the intrachurch dispute over eligibility for nomination to church officeimplicating as it does the more fundamental question of church governance and congregational structuredoes not present a proper issue for judicial consideration.[5]
Well-settled principles prohibit civil courts from resolving ecclesiastical disputes that depend upon inquiry into questions of faith or doctrine. See Presbyterian Church v. Hull Mem'l Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Protestant Episcopal Church v. Graves, supra, 83 N.J. at 580-81, 417 A.2d 19. In such cases, there is the danger that the power of the state may be called upon to breach the wall of separation of church and state by either aiding a faction espousing a particular doctrinal belief, or becoming "entangled in essentially religious controversies." Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976). For this reason, the Establishment Clauses of our Federal and State Constitutions, forbidding the establishment of religion, severely circumscribe the role that civil courts may play in resolving church property disputes. See U.S. Const. amend. 1; N.J. Const. (1947) art. I, ¶ 4; Presbyterian Church v. Hull Mem'l Presbyterian Church, supra, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665; Chavis v. Rowe, 93 N.J. 103, 109-10, 459 A.2d 674 (1983).
To ensure that judicial adjudications are confined to their proper civil sphere, the United States Supreme Court has developed two approaches to church disputes: the deference rule and the rule of "neutral principles." Kedroff v. Saint Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Maryland and Virginia Eldership v. Church of God at Sharpsburg, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970); Kleppinger v. Anglican Catholic Church, 314 N.J.Super. 613, 621-22, 715 A.2d 1033 (Ch.Div.1998).
As to the former, courts "accept the authority of a recognized religious body in resolving a particular doctrinal question." Elmora Hebrew Center, Inc. v. Fishman, 125 N.J. 404, 414, 593 A.2d 725 (1991). In hierarchical situations, courts must defer to the authoritative ruling of the highest church authority in the hierarchy to have considered the religious question at issue. Watson v. Jones, 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666, 676 (1871); Serbian Orthodox Diocese v. Milivojevich, supra, 426 U.S. at 710-14, 96 S.Ct. at *156 2381-82, 49 L.Ed.2d at 163-65; Chavis v. Rowe, supra, 93 N.J. at 108, 459 A.2d 674. Similarly, in disputes involving a church with a congregational structure, "courts should defer to resolutions by a majority (or other appropriate subgroup) of the church's governing body." Elmora Hebrew Center, Inc. v. Fishman, supra, 125 N.J. at 414, 593 A.2d 725. See also Chavis v. Rowe, supra, 93 N.J. at 108, 459 A.2d 674.
Where appropriate, the other approach to church disputes is used regardless of the governing structure of a particular church and involves the application of neutral principles of law to determine disputed questions not implicating religious doctrine or practice. Jones v. Wolf, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775, 784 (1979); Presbyterian Church v. Hull Mem'l Presbyterian Church, supra, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. This approach calls for the examination and interpretation of church documents such as deeds, constitutions, by-laws, and the like in accordance with wholly secular legal rules whose applications do not entail theological or doctrinal evaluations. Jones v. Wolf, supra, 443 U.S. at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785; Elmora Hebrew Center, Inc. v. Fishman, supra, 125 N.J. at 414-15, 593 A.2d 725. It has been suggested, at least in this State, that in a strictly congregational situation, where the congregation answers to no higher ecclesiastical authority in matters of church government, our courts should use "neutral principles" in resolving civil disputes, provided a justiciable controversy is presented. Chavis v. Rowe, supra, 93 N.J. at 110, 459 A.2d 674; Protestant Episcopal Church v. Graves, supra, 83 N.J. at 580, 417 A.2d 19.
Irrespective of the approach used, courts are admonished to scrupulously avoid incursions into questions of ecclesiastical polity or doctrine that would be constitutionally impermissible. Elmora Hebrew Center, Inc. v. Fishman, supra, 125 N.J. at 415, 593 A.2d 725. To be sure, the task of reconciling respect for the autonomy of religious organizations with the responsibility of courts to resolve conflicts involving civil matters is a difficult one. Admittedly, in some instances there is a gray zone between express secular terms and religious doctrine, and the distinction between the court's duty to abstain from religious questions and to decide legal disputes is blurred. Complicating the matter is the fact that the once simple dichotomy between hierarchical and congregational polities does not reflect the diversity of contemporary denominational structures.
We are dealing here with a congregational church. While it is true that in a congregational church setting the majority may rule, it does not follow that if a congregational church is involved, the majority must rule. Watson v. Jones, supra, 80 U.S. (13 Wall) at 724, 20 L.Ed. at 675. Compare Ardito v. Board of Trustees, Our Lady of Fatima Chapel, 281 N.J.Super. 459, 658 A.2d 327 (Ch.Div.1995) with Church of Christ at Centerville v. Carder, 105 Wash.2d 204, 713 P.2d 101 (1986). In Watson v. Jones, it was explained that, when a schism exists in a congregational church that leads to a separation into distinct and conflicting bodies,
the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the *157 acknowledged organism by which the body is governed are entitled to the use of the property.

[80 U.S. (13 Wall.) at 725, 20 L.Ed. at 675 (emphasis added).]
In the present case, the chancery court adjudicated no simple property or contract dispute but rather an essential issue of church governance, polity, and administrationnamely whether Solid Rock is a true democracy controlled by its membership or a more republican, representative structure governed by internal ecclesiastical bodies. Purporting to apply so-called "neutral principles" of law, the chancery court opted for the former based on an interpretation of church by-laws that vested nominating authority in any church member without prior screening and recommendation by the nominating committee.
At issue before the chancery court was the meaning of the phrase "eligible person" in Article IX, Section 3 of church bylaws, permitting any qualified member to "place in nomination the name of any eligible person for any office...." At the January 5, 1999 hearing, the chancery court stated that "any eligible person simply means any person who is of good standing." The court added:
I feel that by looking without any religious content whatsoever ... using neutral principles such as looking at a document, such as these by-laws and constitution, one can interpret that as judges do and lawyers do in looking at any other type of writing or contract.
The word eligible does not carry with it anywhere in this constitution or bylaws or anywhere in my experience or logic any necessarily ecclesiastic or religious meaning. That's being read into by the plaintiffs.... [A]nd that is contrary to th[e] clear spirit of this entire document which in my opinion clearly vests ultimate authority in the church. [A]rticle 3 starts out with the following language, "This church shall be governed by its own sovereign body...."
That means to me pretty clearly that the church is governed by its own sovereign body, not by the executive and advisory board, not even by the deacons or by the trustees, but ultimately by the church itself ... the congregation.
The chancery judge returned to the issue at the June 28, 1999 hearing:
Now the argument of the plaintiffs here is that we're eligible means someone who is screened in ecclesiastical or religious sense. I cannot accept that argument because what the argument does or attempts to do is simply read that sentence out of the constitution and by-laws, to make it a nullity, to make it zero, of no effect. Because if the only people who can screen and determine who's an eligible person for office are the same persons who can put the nominating slate in, the executive and advisory board, then it's really an illusion to say that any member can nominate anybody else.
If it really means the executive and advisory board put up a slate of officers and trustees and if any other member wants to nominate him, he can if we say so, that means nothing. [I] can't believe that that's what the constitution and bylaws mean. I think, to the contrary, the word eligible is using neutral, impartial, non-ecclesiastical, non-religious principles,
....
[R]unning throughout the entire constitution and by-laws of Solid Rock Baptist Church, as I've said before several times, there's a notion underlying ... that ... this church ... is essentially a democratic organization.

*158 It is ultimately one in which the power, the ultimate power, flows only from one place and that is the full body of the congregation because everything that's done ... must ultimately be approved by the majority of the congregation. This is the consummate democratic type of document.
Of course, the court's ruling set the stage for the court-monitored election at which the candidate slate proposed by the opposition faction loyal to the ousted pastor, and not pre-screened for eligibility by the nominating committee, won by majority vote. This shift in the balance of power, in turn, allowed for the eventual return of Carlton to the pastorship of Solid Rock. In other words, the court's decision on the nominating process and procedure proved determinative of the underlying issues of church governance, polity, and ultimately doctrine.
We conclude that the chancery court's ruling in this regard was an inappropriate application of "neutral principles" jurisprudence. First and foremost, the method of neutral principles does not allow for construction of church documents if their interpretation is the focus of dispute and if such documents are not so clear, provable, and express that the civil courts could enforce them without engaging in a searching, and therefore impermissible, inquiry into church polity. Serbian Eastern Orthodox Diocese v. Milivojevich, supra, 426 U.S. at 723, 96 S.Ct. at 2387, 49 L.Ed.2d at 170. Here, the issue of eligibility for office was a highly controverted question of faith within the congregation. Despite the obvious division of opinion, the basis for the chancery court's resolution allowing for floor nominations is unclear, as are the rules of common law it relied upon to structure the church-member relationship implicated in this matter. In essence, the chancery judge interpreted the term "eligible" to be without any religious significance despite plaintiff's contrary contention that the nominating committee pre-screens candidates for spirituality and religiosity. We emphasize that the application of neutral principles does not require courts to "neutralize" ecclesiastical words. If only a matter of statutory construction, we find the disputed phrase ambiguous at best, allowing for the dual interpretations offered by the parties.[6]
*159 In the absence of clear direction in church law, judicial inquiry into church procedures is precluded. Chavis v. Rowe, supra, 93 N.J. at 112, 459 A.2d 674; Kleppinger v. Anglican Church, supra, 314 N.J.Super. at 624, 715 A.2d 1033. Although courts may intervene to determine whether established procedures of a religious organization, as proven, have been followed, Baugh v. Thomas, 56 N.J. 203, 265 A.2d 675 (1970);[7]Hardwick v. First Baptist Church, 217 N.J.Super. 85, 524 A.2d 1298 (App.Div.1987), courts should not intervene where such procedures are not so express, or less than clearly defined, or ambiguous. Serbian Eastern Orthodox Diocese v. Milivojevich, supra, 426 U.S. at 723, 96 S.Ct. at 2387, 49 L.Ed.2d at 170; Chavis v. Rowe, supra, 93 N.J. at 112, 459 A.2d 674. Because of such uncertainty, resolution of intrachurch disputes cannot be made without extensive, and therefore impermissible, inquiry into religious law and polity. The Chavis Court's findings about an equally ambiguous church procedure there are squarely applicable here:
The procedure for removing a deacon is ambiguous. That ambiguity would be properly resolved only by going beyond the by-laws and the constitution of Calvary to a study of the purpose and the philosophy of congregational structure in general and of disciplining congregational deacons in particular.... Such hermeneutics are beyond the Court's realm.
Moreover, insinuation by civil courts into the customs and usages of the bylaws and the constitution, into the administration and the polity of the church in the hope of uncovering clues to the correct disciplinary procedure, threatens the freedom of religious institutions from secular entanglement.

[93 N.J. at 112, 459 A.2d 674.]
In this case, inquiring whether the nominating committee has exclusive ecclesiastical authority to determine eligibility necessitates interpretation of ambiguous religious law, the resolution of which would require a deeper probe into the congregational structure and allocation of power within Solid Rock. For instance, in the absence of an express procedure in church by-law, inquiry need be made as to where within Solid Rock, the rules of polity, accepted by its members before the schism, had placed ultimate authority over the eligibility question. See Jones v. Wolf, supra, 443 U.S. at 617-18, 99 S.Ct. at 3032-33, 61 L.Ed.2d at 794 (Powell, J., dissenting). And assuming the inquiry into custom, practice, and usage at Solid Rock uncovers who makes the eligibility decision, further investigation need be made as to why the church chose its forms of authority and methods of decision-making. An inquiry of this type and its resolution by a civil court "would constitute an `establishment of religion' with a vengeance ..." Protestant Episcopal Church v. Graves, supra, 83 N.J. at 590, 417 A.2d 19 (Schreiber, J., dissenting) (quoting Maryland & Virginia Eldership v. Church of God at Sharpsburg, 254 Md. 162, 254 A.2d 162, 170 (1969), dismissed for want of substantial federal question, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970)).
Simply stated, neutral principles of civil law do not include standards for judging *160 appropriate qualities for church leadership. Galligan, Judicial Resolution of Intrachurch Disputes, 83 Colum. L.Rev. 2007, 2027 (1983) ("When intrachurch disputes demand decisions about doctrinal truth or invite judicial interference with the freedom of churches to organize themselves and appoint their own officials and leaders, neutral principles jurisprudence dictates judicial abstention."). As was noted in Ardito v. Board of Trustees, Our Lady of Fatima, supra, "... this court can discern a no more spiritual matter than a determination by the congregation of who should shepherd its flock." 281 N.J.Super. at 467, 658 A.2d 327.
Indeed, the intrachurch dispute here is the type of primarily religious dispute that led to complete judicial deference in Watson v. Jones, supra. There, the dispute arose within a local church when the central church body, the General Assembly of the Presbyterian Church of the United States, condemned slavery. The majority of the Walnut Street Presbyterian Church of Louisville, the local church, sided with the central body. The dissidents in the congregation did not. The issue presented to the trial court was which set of trustees and elders elected by competing factions of the Walnut Street church should serve the congregation. The matter turned on the power of the General Assembly to prescribe qualifications for local church office, and the question presented essentially concerned the extent of a particular church's ecclesiastical authority. In that context the United States Supreme Court formulated the principle of compulsory deference by courts to decisions of ecclesiastical authorities in hierarchical churches over religious matters which had been committed to them.
The fact that the church in Watson v. Jones was hierarchical does not render the issue of who may prescribe qualifications for office in Solid Rock's congregational church any less religious or doctrinal.[8] We consider the question as much a matter of fundamental doctrine as Solid Rock's constitutional precept that its divine law is the Holy Bible or that its deacons possess the qualifications as recorded in Timothy 3:8-13. As Justice Brennan wrote in Maryland and Virginia Eldership v. Church of God at Sharpsburg:
To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy.
[396 U.S. 367, 369-70, 90 S.Ct. 499, 500, 24 L.Ed.2d 582, 584 (1970) (concurring opinion) (footnote omitted).]
And apropos to the current controversy, in Hardwick v. First Baptist Church, supra, 217 N.J.Super. at 93, 524 A.2d 1298, we intimated that the inquiry whether deacons are required to pass upon membership in the congregationalist church preliminary to a congregational vote implicates *161 doctrinal issues that would be inappropriate for judicial resolution. We reasoned that "[u]nder Baugh v. Thomas there is no impediment to a court's determining whether an individual is a member of [a] church; but under Chavis v. Rowe courts must refrain from adjudicating on theological grounds whether such individuals should be a member." Id. at 92, 524 A.2d 1298.
Application of these principles compels judicial abstention in this case. The chancery court's opposite conclusion to act upon intervenors' November 17, 1998 complaint and order to show cause unwittingly entrenched itself in church affairs, contrary to "neutral principles" jurisprudence that encourages courts to apply only nonintrusive remedies. Unlike Moorman v. Goodman, 59 N.J.Super. 181, 186, 157 A.2d 519 (App.Div.1960), where the court left the determination of the question of ouster to the church membership and thereafter refused to interfere with the action taken, the court below became entangled in election procedures, appointing a monitor with broad powers to determine not only qualifications of voters, but in essence qualifications for office.
Unfortunately, the court's involvement did not end there. After approving the results of the April 29, 1999 election for church officers, the court, through its appointed representative, continued to monitor and supervise the pastoral election of June 29, 1999, after first designating those members responsible for recommending candidates to the church for consideration and vote, a task that the by-laws (Article VI, Section 2) clearly and expressly assign elsewhere.
Although plaintiff Solid Rock initially and properly sought limited judicial intervention to restrain from its premises and pulpit a former pastor indisputably terminated in accordance with express church procedure, intervenors beseeched the chancery court for full resolution of the underlying controversy over church control.[9] Instead of invoking established church procedures pursuant to Article XIII to amend by-laws in need of clarification, intervenors sought judicial adjudication of the ultimate issue. By accepting the invitation, the chancery court became mired in questions not only of church process and procedure, but of governance and polity as well. By deciding to open nominations to the floor without prior recommendation of the nominating committee, the court determined the very nature of the congregational structure of Solid Rock.
It might be suggested that, since the electoral vote reflects the majority's will in a congregational setting, no harm, no foul. But that assumes resolution of the very doctrinal issue that the court below should have abstained from deciding. Of course, if the "eligibility" dispute is not resolved by the court, then by whom since no hierarchical structure exists in a congregational church?
Controlling precedent speaks generally of deferring to "the authoritative ecclesiastical body," but the cases give no guidance as to how to identify the appropriate tribunal. And here, there is no agreement as to the church judicatory body with authority to settle the doctrinal dispute. We decline to refer this matter to any ecclesiastical authority not recognized and accepted by both parties. Indeed, "[i]t is inappropriate for the court to insinuate *162 itself into such an adjudication, even to the extent of determining where the parties without agreement must turn to resolve that issue." Hardwick v. First Baptist Church, supra, 217 N.J.Super. at 92-93, 524 A.2d 1298. See also Elmora Hebrew Center, Inc. v. Fishman, supra, 125 N.J. at 419, 593 A.2d 725 ("It is not proper for a trial court to refer civil issues to a religious tribunal in the first instance."). But see Elmora Hebrew Center, Inc. v. Fishman, 215 N.J.Super. 589, 597-98, 522 A.2d 497 (App.Div.1987) (requiring arbitration by an ecclesiastical forum, unacceptable and unrecognized by the congregation, that was chosen by the trial court.).
The effect of our ruling today reversing those portions of the final judgment that approved the results of the two elections, lifted restraints against defendant Carlton, and dismissed plaintiff's complaint, returns this matter to the status quo ante as of the time plaintiff Solid Rock terminated pastor Carlton in accordance with proper church process and procedure. The matter is therefore remanded to the trial court where plaintiff's complaint seeking permanent restraints against defendant Carlton has been reinstated, with direction to proceed in accordance with this opinion.
Of course, as previously noted, the congregation may elect pursuant to Article XIII to vote to amend Article IX, Section 3 to clarify or modify the nominating procedures detailed therein. See Harrison v. Floyd, 26 N.J.Super. 333, 353, 97 A.2d 761 (Ch.Div.1953). Or the parties may consent to secular arbitration or agree to an ecclesiastical forum recognized by and acceptable to both. Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131, 137 (1929); Hardwick v. First Baptist Church, supra, 217 N.J.Super. at 93, 524 A.2d 1298. Regardless of the forum selected, it remains clear that the court is without jurisdiction to resolve intervenors' complaint.
The orders of January 8, 1999; June 6, 1999; June 18, 1999; July 26, 1999; May 5, 2000; May 23, 2000; and June 1, 2000 are vacated. The matter is remanded to the trial court with instructions to proceed in accordance with this opinion. We do not retain jurisdiction.
NOTES
[1] Article IX, Section 3 of the by-laws states:

At the time of the annual meeting it shall be the privilege of any member present and qualified to vote to place in nomination the name of any eligible person for any office not so nominated. A majority of the ballots cast are necessary for the election of any officer. The Nominating Committee shall be appointed by the Advisory Committee at least thirty days before the annual meeting. There shall be a list of those qualified to fill the various church offices. They shall interview each nominee proposed to ascertain their willingness to serve if elected. The Committee shall nominate one or more persons for each office to be filled and report the names to the church at least one week before the election is to be held.
[2] Article VI, Section 2 requires that the advisory council "... select a representative Pulpit Committee of the Executive Board of the church ..."
[3] Plaintiff specifically challenges the following orders: (1) January 8, 1999 (relating to the intervenor's motion to intervene); (2) June 9, 1999 (accepting the results of the election for church officers); (3) July 26, 1999 (accepting the results of the election for pastor); (4) May 5, 2000 (dismissing plaintiff's complaint to permanently restrain Carlton); (5) May 23, 2000 (final order); and (6) June 1, 2000 (denying continued restraints regarding check writing).
[4] Specifically, plaintiff refers to the executive board with the assistance of the advisory council, who appoints a nominating committee that apparently and indisputably consists of the executive board.
[5] We dismiss as without merit plaintiff's threshold argument that the trial court erred in granting the motion to intervene on January 8, 1999 because no natural persons were pleaded as parties and the "Congregation" is not a legal entity, both in contravention of R. 1:4-1. Given the underlying facts and posture of this case, we find no need for more specificity as to either the identity or status of intervenors in this matter.
[6] "Eligibility" is nowhere defined in church by-laws and there is no further mention of the term in Article IX, Section 3. Furthermore, the parties have not identified any other provisions of church law that address the nomination procedure. Thus, the differing versions are based solely on the language of the challenged provision.

According to plaintiff, the nominating committee has exclusive authority to determine eligibility for office because the by-law specifically charges it with compiling a list of "qualified" individuals who comprise the only persons "eligible" for nomination since the terms "qualified" and "eligible" are by definition synonymous. The argument continues that, since the by-law does not require the nominating committee to "nominate" all persons on the list of qualified persons, therefore any member in good standing may nominate, at the annual meeting, a person determined to be eligible by the nominating committee but not reported to the congregation by the committee as a nominee. Thus, according to plaintiff, the choice of church officers is ultimately expressed by the will of the majority although the choices are limited to "eligible" nominees determined by the nominating committee.
Intervenors, on the other hand, would allow any member "qualified" to vote to place in nomination any "eligible" (i.e., qualified) person neither nominated nor "listed" by the nominating committee. According to intervenors, this interpretation gives effect to a right to nominate conferred on individual members in the first sentence of the by-law in situations where the nominating committee "lists" only one qualified candidate.
[7] In Baugh, a member had been expelled by a majority vote of a Baptist church. The member challenged the voting process. Our Supreme Court held that a civil court could review the ministerial process of tallying votes since it involved determining only whether the vote was held in accordance with established procedures that were neither ambiguous nor vague, emphasizing that no question of religious doctrine or polity was involved in counting votes.
[8] Admittedly, a dispute arising in a congregational church may reach the courts more readily than a similar dispute in an hierarchical setting, since in the former there is theoretically no higher church body to which the aggrieved party may appeal or to which the court may defer. This does not mean, however, that a congregational church is subject to judicial control while other churches are not. Settlement of doctrinal issues between factions of any religious organization is not a proper subject for exercise of judicial power.
[9] Plaintiff formulated its original claim in a manner that enabled the court to determine simply whether established procedures had been followed in the termination of its pastor and to structure an unintrusive and therefore constitutionally unobjectionable remedy of prohibitory injunctive relief, available under the common law.