872 A.2d 150

## No. C–383–02.

LAUREL MACKENZIE, CLARE GEBHART AND COLEEN BRAD-
LEY, INDIVIDUALLY AND IN THEIR CAPACITY AS OFFI-
CERS OF THE LAY FACULTY ASSOCIATION, LOCAL 305,
PATRICIA BURKE AND MARYJANE WHITEHEAD, PLAIN-
TIFFS, v. REGIONAL PRINCIPALS ASSOCIATION, AND
JAMES FREIS, JOHN DOE 1 AND JOHN DOE 2, IN THEIR
CAPACITY AS TRUSTEES OF THE ROMAN CATHOLIC ARCH-
DIOCESE OF NEWARK PENSION PLAN, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

October 6, 2004.

254

*Cohen, Weiss and Simon (Joseph Vitale, Esq.,)* New York, NY, for plaintiffs.

*Jackson Lewis (Richard J. Cino,* Morristown), for defendant Regional Principals Association.

*Connell Foley (Kevin J. Coakley,* Roseland), for defendant James Freis.

KLEIN, J.S.C.

This case presents the issue of whether employee members of a union representing full-time lay teachers of church-operated secondary schools have a right to specific information concerning the operation and finances of their pension plan under Article 1, Paragraph 19 of the New Jersey Constitution. The court is also asked to decide whether the trustees of the pension plan have a fiduciary duty to inform plan members as to its financial status.

Plaintiff Laurel MacKenzie is the President, plaintiff Clare Gebhart the Vice President, and plaintiff Coleen Bradley the Recording Secretary, respectively, of the Lay Faculty Association, Local 305 (the " LFA"), the collective bargaining representative of full-time lay teachers, librarians, guidance counselors and department heads employed in the Regional Secondary Schools of the Archdiocese of Newark. The Regional Principals Association (the "RPA") is the collective bargaining representative for all of the Principals of the Regional Secondary Schools of the Archdiocese. Plaintiffs, all of whom are teachers, participate in the Roman Catholic Archdiocese of Newark Pension Plan (the "Plan"), which provides retirement benefits to full-time lay employees including those represented by the LFA. Defendant James Freis is a trustee of the Plan.

Beginning in March 2002 and continuing until January 2003, the LFA and the RPA negotiated over the terms of a collective bargaining agreement to succeed the agreement that had expired on August 31, 2002. The issues discussed included the level and type of retirement benefits to be provided to the teachers and other employees under the collective bargaining agreement. The RPA provided the LFA with an information packet prior to negotiations which contained enrollment data, tuition data and

consolidated financial data, stating the amount of money contributed to the Plan in the preceding three years.

In June 2002, plaintiff MacKenzie sent a letter requesting certain additional information regarding the Plan as follows: 1) the names of the Plan Trustees; 2) the name of the Plan Administrator; 3) the most recent actuarial valuation of the Plan; 4) the most recent audited financial statement of the Plan, as well as any interim statements subsequent thereto; 5) evidence of any Pension Benefits Guaranty Corp. or similar insurance; and 6) any plan or trust documents and amendments thereto. In July 2002, the RPA provided plaintiffs with the Trust Agreement, the Summary Plan Description, the names of the Trustees and the Plan Administrator as well as information on how to contact the Plan.

Not having received the balance of the items, plaintiffs reiterated their requests in August 2002, this time by letter to the Administrator for the Plan. Counsel for the Plan responded by requesting that the LFA state in writing the specific relevance of the requested materials. Counsel for the LFA responded, *inter alia*, that "[t]he information sought is essential to allow the Union to evaluate whether the Plan is adequately funded to provide the promised schedule of benefits, and to verify that the Plan is being administered in accordance with generally accepted professional and fiduciary standards."

In November 2002, the Plan supplemented the earlier production of documents by providing a printed summary of information about the Plan (containing a Summary Plan Description dated July 1994); an October 9, 1998 summary of certain changes to the Plan effective January 1, 1999; and a copy of a letter dated November 12, 2002 to the Administrator from Jennifer Mebes, an actuary. The letter stated that the market value of the Plan assets exceeded the total estimated present value of accumulated Plan benefits as of July 1, 2002. The Mebes letter also stated that the actuarial methods used were appropriate, the actuarial assumptions reasonable and that all calculations and procedures were in accordance with generally accepted actuarial principles and practices. No other information was forthcoming.

Plaintiffs filed their complaint on November 20, 2002. On January 9, 2003, the LFA and the RPA signed and executed a successor Collective Bargaining Agreement effective September 1, 2002 through August 31, 2005.

Based upon the foregoing facts, which are essentially undisputed, plaintiff brought a motion for summary judgment. Both the RPA and Freis have filed cross-motions for summary judgment. The issue presented appears to be of first impression in this State.

Article I, Paragraph 19 of the New Jersey Constitution provides as follows:

> Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.
>
> [N.J. Const. art. I, ¶ 19.]

In *South Jersey Catholic School Teachers Organization v. St. Teresa of the Infant Jesus Church Elementary School,* 150 *N.J.* 575, 696 *A.*2d 709 (1997), the New Jersey Supreme Court held that lay teachers in church-operated schools were such "persons in private employment" having a state constitutional right to unionize and to engage in collective bargaining.[1] In doing so, the court rejected the employer's argument that compelling church-operated elementary schools in the Diocese of Camden to bargain with the union would violate the Establishment and Free Exercise Clauses of the First Amendment of the United States Constitution. However, the Court found that the scope of the negotiation was limited by the religion Clauses to "wages, certain benefit plans, and any other secular terms or conditions of employment similar to those that are currently negotiable under an existing agreement with

---

[1] The complaint in this matter was filed by five individuals, three of whom have also sued in their capacity as officers of the LFA. The relief sought is that the information be provided to the union. Under these circumstances, the RPA's argument that the complaint should be dismissed because its collective bargaining obligations run only to the LFA, not to individual employees, is without merit.

high school lay teachers employed by the Diocese of Camden". 150 *N.J.* at 581, 696 *A.2d* 709.

■ Defendants argue that the relief sought by plaintiffs constitutes an impermissible extension of the rights granted in *St. Teresa*, which would lead to an "excessive entanglement" of the State in religious affairs, proscribed by *Lemon v. Kurtzman*, 403 *U.S.* 602, 613, 91 *S.Ct.* 2105, 29 *L.Ed.2d* 745 (1971). The Court in *St. Teresa* utilized the three-pronged test of *Lemon* in its detailed analysis of whether requiring collective bargaining was violative of the Establishment Clause. As *St. Teresa* noted, inquiries under the Religion Clauses are "extremely fact sensitive." 150 *N.J.* at 587, 696 *A.2d* 709. Therefore, it must be determined whether engrafting a right to the financial information in question onto the right to collectively bargain raises concerns not present in *St. Teresa*.

There is no question that "church-related elementary and secondary schools have a significant religious mission [,] and ... a substantial portion of their activities is religiously oriented". *Id.* at 591, 696 *A.2d* 709 (quoting *Lemon, supra,* 403 *U.S.* at 613, 91 *S.Ct.* 2105). The Collective Bargaining Agreement of January 9, 2003 between the parties hereto expressly recognized the primarily religious nature of the Regional Secondary Schools.[2] Nevertheless, a major subject of the negotiations was the level and type of retirement benefits to be provided to the teachers and other employees under the Agreement. This demonstrates that there are "some secular terms such as wages and benefit plans that the Diocese can negotiate while preserving its complete and final authority over religious matters". *Id.* at 592, 696 *A.2d* 709.

---

[2] "WHEREAS, the RPA and the LFA recognize the uniqueness of the Schools in that they are Roman Catholic, committed to provide education within the Framework of Catholic principles, the doctrine, the teachings, and the laws and norms of the Catholic Church, and that nothing in this Agreement shall be construed as interfering with the functions and duties of the Schools insofar as they are canonical and religious." Collective Bargaining Agreement, at 2.

Nothing has been presented to suggest that issues concerning the Plan are anything other than purely secular in nature. It has been described as a multi-employer,[3] non-contributory defined benefit plan, wherein benefits are paid pursuant to a formula set forth based upon an employee's years of service and compensation. Employers contribute to the Plan based upon a uniform percentage of covered earnings established by the Trustees. Requiring the production of actuarial valuations and audited financial statements does not infringe upon issues of school structure or doctrine. There is nothing theological about the work of accountants and auditors.

The court is being asked to require only that the LFA be given documents to confirm and corroborate the benefit terms of the current agreement, and to better inform the bargaining process upon its expiration in 2005. As in *St. Teresa,* this does not force the Diocese to negotiate terms affecting religious matters, does not dictate any particular terms to be negotiated or to decide any specific terms of an agreement. *Id.* at 592–93, 696 *A.*2d 709. Nor is any continued court involvement anticipated as a result of this decision. Plaintiffs will be left to their own devices to interpret and utilize the information obtained. Under these circumstances, this case does not present the spectre of "comprehensive, discriminating, and continuing state surveillance." See *Lemon, supra,* 403 *U.S.* at 619, 91 *S.Ct.* 2105.

Moreover, plaintiffs' position is fortified by the "neutral principles" doctrine adopted by the Supreme Court in *St. Teresa,* and further articulated in *Solid Rock Baptist Church v. Carlton,* 347 *N.J.Super.* 180, 789 *A.*2d 149 (App.Div.), *certif. denied,* 171 *N.J.* 440, 794 *A.*2d 179 (2002). This approach calls for the use of wholly secular legal rules whose applications to religious parties do not

---

[3] The record indicated that as of July 1, 2000, there were approximately 250 separate employer groups who were active participants in the Plan, covering approximately 2,760 employees in addition to 3,306 terminated vesteds, retirees and beneficiaries. Employees of the Regional High Schools accounted for 255 of the active employees and 341 of the former employees category.

entail theological or doctrinal evaluations. 347 *N.J.Super.* at 192, 789 *A.*2d 149 (citing *Jones v. Wolf*, 443 *U.S.* 595, 604, 99 *S.Ct.* 3020, 61 *L.Ed.*2d 775 (1979)). *See, e.g., Elmora Hebrew Center, Inc. v. Fishman*, 125 *N.J.* 404, 593 *A.*2d 725 (1991) (holding that rabbi's contract, or non-religious condition of employment, could be determined by civil court, in contrast to scope of his duties which had to be decided by a religious authority); *Baugh v. Thomas*, 56 *N.J.* 203, 265 *A.*2d 675 (1970) (holding that civil court could review ministerial process of tallying votes to determine whether it complied with established procedures that were neither ambiguous nor vague).

In *Solid Rock*, the court cautioned that

> the method of neutral principles does not allow for construction of church documents if their interpretation is the focus of dispute and if such documents are not so clear, provable and express that the civil courts could enforce them without engaging in a searching, and therefore impermissible, inquiry into church polity. [347 *N.J.Super.* at 195, 789 *A.*2d 149.]

There, the issue of eligibility for office within the church involved a "highly controverted question of faith" that required the court to interpret ambiguous terms that were capable of an ecclesiastical meaning, and thereby delve into religious law and polity. *Id.* at 195–96, 789 *A.*2d 149.

In this case, as stated previously, defendants' argument does not even go so far as to raise any ambiguity or interpretational issues. Instead, they have posed a blanket objection to an "excessive entanglement," without any showing whatsoever of the need to inquire into questions of faith or doctrine. The following language in *St. Teresa*, taken from the Appellate Division's opinion in that case, is applicable here:

> Concern over a court's ability to make the necessary distinctions between the secular and the theological is, in our view, no obstacle given the anticipated nature of the collective bargaining process....As for the concerns regarding church autonomy: while these are legitimate, they are outweighed in this situation by the compelling governmental interest expressed in our State's constitutional provision guaranteeing the rights of working men and women.

150 *N.J.* at 601, 696 *A.*2d 709 (quoting from 290 *N.J.Super.* at 389–91, 675 *A.*2d 1155); *See also Catholic High School Ass'n of the*

*Archdiocese v. Culvert,* 753 *F.*2d 1161, 1171 (2d Cir.1985) (recognizing the State's compelling interest in the "preservation of industrial peace and a sound economic order").

Defendants' briefs do little to explain just how the "wall of separation" between church and state will be breached in this instance. Their suggestion that this is one of "certain" benefit plans that *St. Teresa, supra,* 150 *N.J.* at 581, 696 *A.*2d 709, would exclude from the ambit of Article 1, Paragraph 19 of the New Jersey Constitution is not at all supported. The evidence before the court is that this is a secular term or condition of employment as to which plaintiffs require information to intelligently exercise their right to collectively bargain. Defendants' mantras of "excessive entanglement" or "leviathan-like" regulation are therefore unavailing. With respect to the latter reference in particular, it further appears that defendants have misinterpreted the Supreme Court's statements in *St. Teresa.* It held that the inapplicability of the federal statutory scheme regulating private employer-employee relations, under which the National Labor Relations Board (NLRB) acts as monitor-referee, virtually eliminates the concerns of secular intrusion. *See also NLRB v. Catholic Bishop of Chicago,* 440 *U.S.* 490, 507, 99 *S.Ct.* 1313, 59 *L.Ed.*2d 533 (1979) (refusing to apply National Labor Relations Act to lay teachers in church-operated schools).

In short, there is no "leviathan-like governmental regulatory board" to monitor the parties' negotiations. *St. Teresa, supra,* 150 *N.J.* at 584, 696 *A.*2d 709 (quoting from the Appellate Division opinion, 290 *N.J.Super.* at 391, 675 *A.*2d 1155). It is left to the courts to decide, on a case by case basis, the scope of the right to collective bargaining. *Cooper v. Nutley Sun Printing Co.,* 36 *N.J.* 189, 194, 175 *A.*2d 639 (1961). For the reasons stated above, this court is satisfied that subject matter jurisdiction exists and that it is being asked to enforce purely secular rights.

Because of the inapplicability of the National Labor Relations Act (" NLRA"), defendants take issue with plaintiffs' primary reliance on cases arising under the Act to support their

claims. As noted previously, the specific right and remedy plaintiffs are seeking has not been addressed by any New Jersey court. In the absence of clear precedent, the courts have noted that "certain identified public policies" should be kept in mind when attempting to apply Article 1, Paragraph 19 of the New Jersey Constitution to a particular factual setting. *South Jersey Catholic Teachers Organization v. Diocese of Camden,* 347 *N.J.Super.* 301, 311, 789 *A.*2d 682(Ch.2000) (citing *St. Teresa, supra,* 150 *N.J.* at 600, 696 *A.*2d 709). Although the federal decisions are by no means binding, they can be useful in reaching a just result. *Comite Organizador de Trabajadores Agricolas (COTA) v. Molinelli,* 114 *N.J.* 87, 98, 552 *A.*2d 1003 (1989); *Cooper v. Nutley Sun Printing Co., supra,* 36 *N.J.* at 200, 175 *A.*2d 639. Finally, it is appropriate to apply equitable principles to resolve disputes of this type. *Id.* at 198–200, 175 *A.*2d 639.

In the regulatory context, it is generally accepted that demands for information regarding wage data and fringe benefits are "presumptively lawful requests and the union need not show the precise relevancy of the requested information to particular bargaining issues under consideration unless effective employer rebuttal comes forth." *Weber Veneer & Plywood Co.,* 161 *N.L.R.B.* 1054, 1056 (1966) (observing that such inquiries are "obviously related to the bargaining process"); *see also Nat'l Labor Relations Bd. v. Conrock Co.,* 263 *N.L.R.B.* 1293, 1294 (1982).

In *Nat'l Labor Relations Bd. v. Beyerl Chevrolet,* 221 *N.L.R.B.* 710, 720 (1975), the employer had refused to provide the union with "information concerning the funding, asset picture, and other data essential to informed and intelligent bargaining" concerning their pension plan. Rather than allow the employer to provide only summaries of the plan, the Board required the employer to "open [its plan] to the light of day so that the union, and through it the employees, will know exactly what they may be getting, [and] the likelihood that they will get it." *Id.* at 721. To the same effect is *Curtiss–Wright Corp.,* 193 *N.L.R.B.* 940, 952 (1971) (holding that in order to have intelligent negotiations, the "raw

facts" must be provided, including the fund's portfolio breakdown); *see also Local 13, Detroit Newspaper Printing & Graphic Communications Union v. N.L.R.B.*, 598 *F.*2d 267, 271–72 (D.C.Cir. 1979) ("A broad disclosure rule is crucial.... Unless each side has access to information enabling it to discuss intelligently and deal meaningfully with bargainable issues, effective negotiation cannot occur").

The philosophy articulated through these cases resonates in the situation presented here. A constitutional right that is ineffective and uninformed is no right at all. Just as the constitutional right to "bargain collectively" was hollow absent an affirmative duty on the employer, *see Johnson v. Christ Hospital*, 84 *N.J.Super.* 541, 555, 202 *A.*2d 874 (Ch.Div.1964), *aff'd*, 45 *N.J.* 108, 211 *A.*2d 376 (1965), the same is true where one side is uninformed in the process. The employees' union should not "have to approach the bargaining table cap-in-hand and attempt to engage in shadow-box negotiation about a 'mystery package' rather than from knowledge." *Curtiss–Wright Corp., supra.*, 193 N.L.R.B. at 952. There is no reason why plaintiffs should not have access to all of the documents reviewed by the employer's actuary so that they do not have to take her word for it, and can test her conclusions. This court believes that to hold otherwise is to make a mockery of "good faith" bargaining. Therefore, summary judgment is entered in favor of plaintiffs on their claims against the RPA, and said defendant's cross-motion for summary judgment as to Count One is denied.

■ There remains for decision the claim of plaintiffs in Count Two of the complaint, for breach of fiduciary duty against the Trustees of the Plan. On this claim, plaintiffs ask the court to rule, as a matter of law, that New Jersey decisional law governing the duties of trustees requires disclosure of the requested documents. However, defendant Freis, on behalf of the Trustees of the Plan, cross-moves for summary judgment on the basis that they fulfilled the disclosure duties of a pension plan trustee.

 It is axiomatic that the duties of a trustee depend primarily upon the terms of the trust. *Branch v. White*, 99 *N.J.Super.* 295, 306, 239 *A.*2d 665 (App.Div.), *certif. denied*, 51 *N.J.* 464, 242 *A.*2d 13 (1968). Where, as here, the terms of the Trust Agreement do not provide for the provision of financial documents, the Trustees' obligation in this regard is to be determined by principles and rules developed by courts of equity. *Ibid.* *cf. Slocum v. Borough of Belmar*, 238 *N.J.Super.* 179, 186–87, 569 *A.*2d 312 (Law Div.1989); *Shallcross Express v. Local 478 Trucking & Allied Industries Pension Fund*, 119 *N.J.Super.* 196, 208, 290 *A.*2d 744 (Law Div.1972) (holding that trustees of a fund had an obligation to determine, prior to acceptance of any contributions, that they were made on behalf of eligible employees).

A review of the cited cases reflected that an authority commonly relied upon by courts is the *Restatement (Second) of Trusts* § 173, stating that a "trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust." The courts have held that trustees are "required to make full disclosure of all facts within their knowledge which are material for beneficiaries to know for the protection of their interests." *Branch v. White, supra,* 99 *N.J.Super.* at 307, 239 *A.*2d 665; *Shallcross Express v. Local 478 Pension Fund, supra,* 119 *N.J.Super.* at 208–09, 290 *A.*2d 744.

 The standard for fiduciaries that is gleaned from the common law and the *Restatement (Second) of Trusts* is that of reasonableness, i.e. such care and skill as a person of ordinary prudence would exercise in dealing with his own property. Whether the duty has been satisfied depends upon the circumstances as they reasonably appear at the time and not at some subsequent time when the conduct is called into question. *See Restatement (Second) of Trusts* § 174 comment b. (1959).

Among the circumstances to be reasonably considered by a trustee, in the absence of definitive terms of the trust instrument, are the principles and rules developed by courts. Where there is no state common law directly on point, the Trustees should be permitted to obtain guidance from decisions under ERISA, even though ERISA's disclosure requirements do not apply to a "church plan". 29 *U.S.C.A.* § 1003; *Colarusso v. Transcapital Fiscal Systems,* 227 *F.Supp.*2d 243, 253–54 (D.N.J.2002). Thus, plaintiffs' argument that ERISA is irrelevant because their claims arise under state common law misses the point. The issue is whether the trustees satisfied their duty to use ordinary prudence in placing reliance upon ERISA case law, at least in part.

The trustees have cited cases holding that Section 104(b)(4) of ERISA does not require the production of actuarial reports. *See Maiuro v. Federal Express Corporation,* 843 *F.Supp.* 935 (D.N.J.), *aff'd,* 43 *F.*3d 1461 (3d Cir.1994); *Board of Trustees v. Weinstein,* 107 *F.*3d 139, 143 (2d. Cir.1997) (holding that the required disclosure of formal plan instruments is "to arm plan participants with specific knowledge of their rights and remedies with respect to employee benefit plans, rather than to compel disclosure of the more technical data contained in actuarial valuation reports"); *Hickey v. Pennywitt,* 33 Employee Benefits Cas. 1064 (N.D.Ohio 2004) (holding that documents such as investment guidelines, asset class lists stating investment portfolios and target percentages, risk and return characteristics of plan funds and the name of the investment manager are not "other instruments" within the contemplation of the statute).

As plaintiffs point out in their reply papers, this is somewhat interpretational in that other federal courts have taken a more liberal view of 29 *U.S.C.A.* § 1024(b)(4). However, this court believes that a fiduciary should not be charged with reconciling conflicting decisions; nor should it be required to anticipate a judicial extension of existing law as contained in this decision. Accordingly, I find that in declining to provide the outstanding documents, the trustees did not breach their fiduciary duty and

should not be held liable to plaintiffs. With respect to Count Two, summary judgment is granted in favor of defendant and plaintiffs' motion is denied.

The Court has entered Orders consistent with this opinion.