593 A.2d 725

ELMORA HEBREW CENTER, INC., A RELIGIOUS CORPORATION OF NEW JERSEY, PLAINTIFF–APPELLANT, v. YALE M. FISHMAN, CHARLES APTOWITZER, MARK MASON AND BRUCE BUECHLER, DEFENDANTS–RESPONDENTS, AND HOWARD POLLICK, DEFENDANT.

Argued February 26, 1991—Decided July 29, 1991.

Russell M. Woods argued the cause for appellant (Woods & Trembulak, attorneys).

Yale M. Fishman argued the cause for respondent pro se.

Arnold S. Cohen argued the cause for respondents Charles Aptowitzer, Mark Mason and Bruce Buechler (Balk, Oxfeld, Mandell & Cohen, attorneys).

Ronald K. Chen submitted a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey.

Lenore Davis submitted a brief on behalf of amicus curiae National Jewish Commission on Law and Public Affairs.

The opinion of the Court was delivered by

HANDLER, J.

This case presents the question of when a civil court's power to adjudicate actions involving religious parties or issues may be limited by the strictures of the constitutional separation of church and state. It arises from a dispute over a synagogue's employment of a rabbi. In its efforts to terminate the rabbi's employment, the synagogue filed this action in Superior Court, Chancery Division. The trial court, after determining that the dispute involved questions of religious doctrine, referred the parties to a religious tribunal for adjudication of those questions. The synagogue contested the selection of the particular religious tribunal because it represented a different religious

sect or denomination; and there was some controversy about the scope of the religious tribunal's jurisdiction. Nonetheless, both parties continued their participation before the religious tribunal until, following lengthy hearings, that tribunal determined all matters in dispute. The Chancery Division then entered a judgment reflecting the religious tribunal's resolution. The synagogue now asserts that the trial court's adoption of the judgment of a religious body is an unconstitutional establishment of a particular sect, or violates the synagogue's free-exercise rights by subjecting it to the authority of a religious body that it does not recognize.

I

In 1983, defendant Yale M. Fishman was hired as a rabbi by the plaintiff, Elmora Hebrew Center, Inc. (EHC), a synagogue located in Elizabeth. Fishman is an ordained orthodox rabbi. The synagogue apparently does not align itself with all tenets of orthodox Judaism, but adheres to some aspects of orthodox observance. When Fishman was hired, Fishman and the EHC, by the Chairman of its Board of Trustees, signed an employment contract that provided for a two-year term with an automatic two-year renewal unless either party gave notice not to extend the term; the contract required Fishman to "perform all normal rabbinical duties incumbent upon a Rabbi of a traditional Jewish Congregation." The EHC was to provide Fishman with living quarters "or the house provided for the Rabbi, if and when it becomes available."

Sometime after Fishman's first year as rabbi, disputes began to arise between Fishman and some members of the congregation and of the Board of Trustees. Fishman's opponents asserted that he was not fulfilling his duties as rabbi and that he had improperly dealt with some of the congregation's funds. On the other hand, Fishman and his supporters maintained that the controversies arose due to improper attempts by some members of the congregation to gain control of the house that the

synagogue owned as a residence for its rabbi. The disputes apparently led to the development of opposing factions within the congregation and to ambiguous dealings with Fishman, with conflicting efforts to terminate or extend his employment, depending upon which faction was acting on behalf of the EHC at a given time. For example, some members at one point elected a new president of the congregation, who later signed an agreement to submit the controversy to a rabbinical court; however, other members denied the validity of that election, and pursued their remedies against Fishman in the civil court.

In February 1985, despite the history of disagreements, a majority of the Board of Trustees voted to renew Fishman's contract for a three-year term. However, the renewal contract was not signed until the fall of that year; and the renewal certainly did not resolve the disputes. Sometime during 1985, some members of the synagogue learned that Fishman had been attending law school full-time; they felt that he had concealed this from the congregation and that his status as a law student had exacerbated his perceived dereliction of his rabbinical duties. In the fall of 1985, some members of the congregation became convinced that Fishman had fraudulently altered his renewal contract to reflect terms more favorable to him than those the Board had approved earlier that year. Fishman was also accused of diverting grant moneys and synagogue revenues for his own use. The disputes grew more serious, until on February 2, 1986, the Board of Trustees voted to remove Fishman. Fishman did not accept the dismissal. In September 1986, the congregation hired a new rabbi; however, Fishman continued to claim the dismissal was invalid and refused to vacate the house owned by the synagogue. According to the members of the congregation who wished to oust Fishman, he disrupted services conducted by the new rabbi, and organized invalid meetings of the congregation to secure actions in support of his position.

In March 1986, the EHC filed this action alleging, *inter alia*, that Fishman had disrupted religious services and the orderly

transaction of the congregation's business, had prevented other rabbis from serving the congregation, had diverted contributions and grant moneys, and had refused to surrender possession of the synagogue's residence. The complaint requested damages and an accounting of the EHC's funds allegedly wrongfully appropriated, and sought to enjoin Fishman from interfering in the affairs of the EHC. Fishman took the position that the dispute was entirely religious, because the status of an orthodox rabbi vis-a-vis his congregation is determined solely by the doctrines of Jewish orthodoxy. In April 1986, the trial court determined that some of the questions underlying the dispute were religious and could not be adjudicated by a civil court; by order dated April 23, 1986, that court directed the EHC to submit the dispute to a Beth Din, or rabbinical court, for the resolution of "its allegations that [Fishman] has failed to perform his spiritual functions as Rabbi." The court did not determine that the entire controversy was religious. It reserved for civil adjudication any contract or civil issues remaining for resolution after the Beth Din's determination. The tribunal selected by the court was the Beth Din of the Union of Orthodox Rabbis of the United States and Canada, a representative of orthodox Judaism. The EHC took an interlocutory appeal, asserting that the referral violated EHC's free-exercise rights because the dispute was contractual in nature, not religious; and further asserting that the orthodox Beth Din had no authority over it. However, the Appellate Division affirmed the trial court's order. 215 *N.J.Super.* 589, 522 *A.*2d 497 (1987). That court concluded that "religious questions permeate all of the issues in this case," and did not question the designation of the orthodox Beth Din. *Id.* at 596, 522 *A.*2d 497. The EHC at that point did not petition for further review of the Appellate Division's decision on the interlocutory appeal.

During the hearings before the Beth Din in 1986 and 1987, the EHC initially objected that the procedures of that tribunal, and especially its designation of a panel to hear the case, were

unfair and inappropriate to the disputed issues. The EHC also argued that the scope of the Beth Din proceedings should be narrowed. The synagogue therefore brought a motion in the Chancery Division to disqualify the tribunal that had been appointed by the Beth Din. At that point, the trial court interpreted the earlier decision of the Appellate Division as referring all issues between the parties to the rabbinical tribunal, and acknowledged that the Beth Din itself was assuming complete jurisdiction. The court nonetheless ordered the EHC to continue with the Beth Din adjudication. The synagogue did not further challenge that determination and continued its participation before the Beth Din. During the ensuing Beth Din hearings, the EHC seemingly acquiesced in the Beth Din's assumption of complete jurisdiction. The EHC also argued vigorously that the Beth Din should assume additional jurisdiction over two libel actions that Fishman had brought against EHC members in the Law Division.

On November 11, 1987, the Beth Din issued a decision on all issues. Although it found no basis for the accusations against Fishman, it determined that "for the sake of peace," Fishman should voluntarily resign his position; and the EHC should pay Fishman $100,000 as damages. It also ordered Fishman voluntarily to dismiss the libel actions. In May 1988, on Fishman's application, the Chancery Division entered judgment reflecting the Beth Din's decision, but permitting the EHC to offset against the $100,000 damages any salary that had been paid to Fishman pursuant to court orders during the pendency of the action. The Chancery Division determined that the EHC had consented to the Beth Din adjudication and found that the evidence of consent was sufficient to obviate any need for a plenary hearing. The court analogized the Beth Din proceedings to common-law arbitration, and reasoned that the tribunal's result could not be challenged in the absence of any evidence of fraud, partiality, or misconduct. Finally, the court rejected the EHC's argument that Fishman himself had failed to abide by the Beth Din's determination because he had not

dismissed the libel actions voluntarily. On the EHC's appeal, the Appellate Division affirmed, substantially on the basis of the trial court's opinion. 239 *N.J.Super.* 229, 570 *A.*2d 1297 (1990). We granted the EHC's petition for certification. 122 *N.J.* 195, 584 *A.*2d 253 (1990).

## II

A longstanding principle of first amendment jurisprudence forbids civil courts from deciding issues of religious doctrine or ecclesiastical polity. *Watson v. Jones,* 80 *U.S.* (*13 Wall.*) 679, 728–30, 20 *L.Ed.* 666, 676–77 (1871) (decision prior to application of the first amendment to the States, but "nonetheless informed by First Amendment considerations," *Presbyterian Church v. Hull Church,* 393 *U.S.* 440, 445, 89 *S.Ct.* 601, 604, 21 *L.Ed.*2d 658, 663 (1969)); *Chavis v. Rowe,* 93 *N.J.* 103, 105, 459 *A.*2d 674 (1983) (court could not adjudicate dispute over dismissal of deacon, where "resolution of ... claims would require an excursion into matters of church doctrine and polity"). However, religious parties or institutions are not thereby the less entitled to civil adjudication of secular legal questions. For example, in *Watson v. Jones, supra,* 80 *U.S.* (*13 Wall.*) at 714, 20 *L.Ed.* at 670, the United States Supreme Court established the basic tenet that "[r]eligious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints." In fact, the civil courts to some degree have a duty to protect state interests in the resolution of disputes over ownership and control of property. *See Jones v. Wolf,* 443 *U.S.* 595, 602, 99 *S.Ct.* 3020, 3025, 61 *L.Ed.*2d 775, 784 (1979) ("The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively" (citing *Presbyterian Church v. Hull Church, supra,* 393 *U.S.* at 445, 89 *S.Ct.* at 604, 21 *L.Ed.*2d at 663)). By analogy, courts

have the power, and perhaps a duty as well, to enforce secular contract rights, despite the fact that the contracting parties may base their rights on religious affiliations. For example, in *Jewish Center v. Whale*, 86 *N.J.* 619, 432 *A.*2d 521 (1981), this Court upheld the rescission of a rabbi's employment contract on the basis of the civil principle of fraudulent misrepresentation. Although the parties in *Whale* did not raise the question of a civil court's power to decide their dispute, if, as had happened in that case, a clergyman seeking employment misrepresents his experience to obfuscate a criminal background, the standard secular law of fraud presumably would apply without reference to religious doctrines that may address such untruthfulness.

Thus, courts can and do decide secular legal questions in cases involving some background issues of religious doctrine, so long as the courts do not intrude into the determination of the doctrinal issues. In such cases courts have arrived at several acceptable means for confining their adjudications to the proper civil sphere. Civil courts can accept the authority of a recognized religious body in resolving a particular doctrinal question. In disputes involving a church governed by a hierarchical structure, courts should defer to the result reached by the highest church authority to have considered the religious question at issue. *Watson v. Jones, supra*, 80 *U.S.* (*13 Wall.*) at 727, 20 *L.Ed.* at 676; *Chavis v. Rowe, supra*, 93 *N.J.* at 108, 459 *A.*2d 674. Similarly, in disputes involving a church with a congregational structure, courts should defer to resolutions by a majority (or other appropriate subgroup) of the church's governing body. *Chavis v. Rowe, supra*, 93 *N.J.* at 108, 459 *A.*2d 674.

Without regard to the governing structure of a particular church, a court may, where appropriate, apply neutral principles of law to determine disputed questions that do not implicate religious doctrine. *Jones v. Wolf, supra*, 443 *U.S.* 595, 99 *S.Ct.* 3020, 61 *L.Ed.*2d 775. "Neutral principles" are wholly secular legal rules whose application to religious parties

or disputes does not entail theological or doctrinal evaluations. This "neutral principles" approach is particularly suited to adjudications of property disputes. For example, in *Jones v. Wolf,* involving a schism between a local church and a hierarchical church organization, the Supreme Court held that there would be no violation of the first or fourteenth amendment if a state court were to resolve a church property dispute by application of "neutral principles" to the language of deeds, church charters, state statutes governing the holding of church property, and provisions in a church's constitution. Similarly, neutral principles may sometimes be invoked to resolve disputes concerning a religious entity's membership. *See, e.g., Hardwick v. First Baptist Church,* 217 *N.J.Super.* 85, 524 *A.*2d 1298 (App.Div.1987) (court can examine by-laws and church policies to resolve dispute over church membership). The application of the "neutral principles" doctrine presents the potential advantage of permitting parties to assure a consistent approach to questions of property ownership or church membership by inclusion of appropriate terms in deeds, contracts, or by-laws. *See, e.g., Jones v. Wolf, supra,* 443 *U.S.* at 606, 99 *S.Ct.* at 3027, 61 *L.Ed.*2d at 786 ("At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church.").

Nonetheless, civil adjudications by deference to authoritative decisions by church officials, or by application of "neutral principles," must always be circumscribed carefully to avoid courts' incursions into religious questions that would be impermissible under the first amendment. In *Jones v. Wolf, supra,* 443 *U.S.* at 604, 99 *S.Ct.* at 3026, 61 *L.Ed.*2d at 785, even while approving in theory a state's freedom to apply "neutral principles" to a dispute over church property, the United States Supreme Court also cautioned that courts must avoid questions of ecclesiastical polity or doctrine and should

ordinarily defer to recognized church authority on such questions. Moreover, there are many cases in which court intervention is simply inappropriate because judicial scrutiny cannot help but violate the first amendment. Such was *Chavis v. Rowe, supra,* where this Court found that no civil jurisdiction could be asserted over a religious dispute about a deacon's dismissal. The United States Supreme Court had announced a similar principle of abstention in *Presbyterian Church v. Hull Church, supra,* ruling that a civil court could not determine whether a general church organization had departed from its original doctrines and tenets; and in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 96 *S.Ct.* 2372, 49 *L.Ed.*2d 151 (1976), finding that a state court had no power to overturn the decisions about church clergy and governance that had been made by the highest authority of a hierarchical church.

In recent years, cases such as this one, involving the contractual employment rights of members of the clergy, have often been the occasion for difficult distinctions between the courts' duties to abstain from religious questions, and to decide legal disputes. *See, e.g., Minker v. Baltimore Annual Conference of United Methodist Church,* 894 *F.*2d 1354 (D.C.Cir.1990); *Natal v. Christian and Missionary Alliance,* 878 *F.*2d 1575 (1st Cir.1989); *O'Connor Hosp. v. Superior Court,* 195 *Cal. App.*3d 546, 240 *Cal.Rptr.* 766 (1987). In this case, the EHC has at various points asserted that its dispute with Fishman involves purely secular principles of contract law. Further, the EHC has argued that reference to the Beth Din of the Union of Orthodox Rabbis violates the EHC's free-exercise rights and constitutes an impermissible establishment of one sect of Judaism over another because the EHC does not recognize the authority of that body.

We do not reach either the first amendment jurisdictional questions that underlie this case; or the question of subsequent appealability of issues previously raised on interlocutory appeals but not further pursued until after entry of final judg-

ment. Rather, we believe, as did the trial court and the Appellate Division, 239 *N.J.Super.* at 232, 570 *A.*2d 1297, that the EHC's consent to proceedings before the Beth Din precludes its later challenges to the results of those proceedings.

Although there has been some ambiguity throughout concerning the voluntariness of the EHC's submission to the Beth Din, we agree with the Appellate Division that there is sufficient evidence to support the trial court's finding of consent. In deciding to enter its judgment based on the Beth Din's resolution, the Chancery Division had before it an extensive record, including numerous affidavits of the parties, correspondence and documents from the Beth Din proceedings, and documentary evidence of the religious affiliations of the EHC and the usual processes for resolving similar disputes in Jewish institutions. It was well within the trial court's discretion to base its decision on the various facts pointing to the EHC's consent. At least some of the EHC's members favored adjudication before the Beth Din from as early as 1986. The EHC's president, fully advised by counsel knowledgeable in both civil and Jewish law, executed a written arbitration agreement submitting the dispute to the Beth Din. And perhaps most persuasive, the EHC apparently thought that the Beth Din adjudication presented a tactically advantageous opportunity for dealing with other aspects of the congregation's disputes with Fishman. Thus, the EHC's counsel successfully persuaded the Beth Din to assert its jurisdiction over Fishman's two libel suits against members of the EHC's congregation.

When entering its judgment based on the Beth Din's decision, the Chancery Division drew an analogy between the EHC's submission to the Beth Din's jurisdiction and common-law arbitration. That analogy is apt, and it is reflected in one of the approaches that the United States Supreme Court has suggested for dealing with church-property cases presenting religious issues. In *Gonzalez v. Archbishop,* 280 *U.S.* 1, 16, 50 *S.Ct.* 5, 7, 74 *L.Ed.* 131, 137 (1929), the Court ruled that a decision about

appointment to a Roman Catholic chaplaincy must be left to religious authorities even if it had a secondary effect on property rights, but also suggested that a civil court might be empowered to examine the propriety of such an appointment if it were a product of "fraud, collusion, or arbitrariness." The Court further supported the propriety of such "marginal review" of church decisions in *Presbyterian Church v. Hull Church, supra,* 393 *U.S.* 440, 89 *S.Ct.* 601, 21 *L.Ed.*2d 658; however, in *Serbian Eastern Orthodox Church v. Milivojevich, supra,* 426 *U.S.* 696, 96 *S.Ct.* 2372, 49 *L.Ed.*2d 151, the Court specifically eliminated "arbitrariness" as a basis for civil-court inquiry into whether decisions of a church tribunal complied with the church's own laws and regulations. Nonetheless, the still viable grounds of inquiry into a religious determination, namely, fraud and collusion, parallel the extremely limited basis on which courts will review the results of conventional arbitrations. Another analog to secular arbitration is presented in *Hardwick v. First Baptist Church, supra,* 217 *N.J.Super.* 85, 524 *A.*2d 1298, where the Appellate Division required parties to participate in selecting appropriate religious authorities to determine underlying religious questions.

 These natural analogs to arbitration suggest that it is appropriate that the EHC, like a party to a civil arbitration, should be bound to observe the Beth Din's determination of any issues that the EHC agreed to submit to that tribunal. By way of comparison, we note that in statutory arbitrations, a party is bound by arbitrators' determinations even of issues clearly beyond the scope of a contractual agreement to arbitrate, so long as the party consented to the submission of those issues to the arbitrators. *See, e.g., In re Grover,* 80 *N.J.* 221, 403 *A.*2d 448 (1979). Thus, in the present procedural posture of the case, the initial concerns over whether some issues resolved by the Beth Din were more "secular" than religious, and therefore appropriately should have been resolved by a civil court, have dissipated. For the reasons expressed by the lower courts, the parties are now bound by the Beth Din's decision, because of

their plenary agreement to submit their disputes to that body for its adjudication.

 Our conclusion is not an endorsement of the mesne procedural determinations by which the lower courts surrendered jurisdiction over the civil aspects of this case. It is not proper for a trial court to refer civil issues to a religious tribunal in the first instance. The United States Supreme Court has forbidden that course: "The First Amendment prohibits a State from employing religious organizations as an arm of the civil judiciary to perform the function of interpreting and applying state standards." *Presbyterian Church v. Hull Church, supra,* 393 *U.S.* at 451, 89 *S.Ct.* at 607, 21 *L.Ed.*2d at 667. In the present case, the EHC's claims, at least as reflected in the allegations of the complaint, involved several civil issues, *e.g.,* the alleged diversion of funds, the possible alteration of a contract, the status of the residence, and the request for an accounting. Such issues seem appropriate for civil adjudication without any danger of entanglement in religious doctrine or polity. Indeed, the allegations that Fishman had diverted payments and grant funds belonging to the congregation to his own accounts are certainly cognizable by civil courts, regardless of whether such acts may also offend religious tenets.

 When the Chancery Division originally referred the case to the Beth Din, it did not sufficiently identify and circumscribe the doctrinal issues to which a religious tribunal's jurisdiction should be limited. On the EHC's interlocutory appeal of the referral to the Beth Din, the Appellate Division blurred the distinction between civil and religious issues, asserting that "religious questions permeate all of the issues in this case," 215 *N.J.Super.* at 596, 522 *A.*2d 497. To the contrary, as we have noted, distinct civil issues should have been reserved by the court not merely because it had the discretion to decide them, but also because it had a duty to do so. In addition, the civil

court must reach a soundly-based determination of which religious tribunal has the authority to resolve the religious dispute.

It is imperative, in order to avoid unconstitutional entanglements of civil and religious issues and to preserve the right to civil adjudication of secular disputes, for a trial court to specify which issues are religious and therefore to be settled by religious authority; and which issues are civil and to be resolved by the court. For example, only a religious authority may be able to decide the scope of duties of an "orthodox Rabbi"; but a civil court can certainly determine the term of a contract or non-religious conditions of employment. Thus, when faced with cases such as this, trial courts initially should entertain full briefing and argument by the parties as to what issues are "religious" and what are "civil"; and as to what is the proper authority to decide "religious" questions. By providing complete and clear rulings on such questions before referral to any religious tribunal, a trial court will provide the parties and appellate courts with a clear record for informed review of any possible first amendment issues.

### III

In this case, as both lower courts noted, the EHC's continuing appeals have presented insufficient grounds to question the validity of the EHC's earlier voluntary submission to the Beth Din.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.