985 A.2d 197 (2009)
411 N.J. Super. 211
Yaakov ABDELHAK, Plaintiff-Appellant,
v.
The JEWISH PRESS INC., Oleg Rivkin, Richard I. Scharlat and Gabrielle Tito, Defendants-Respondents, and
Oleg Rivkin, Defendant/Third Party Plaintiff-Respondent,
v.
Zalman Levine, Rachelle Mandelbaum and Allan Cohen, Third-Party Defendants-Respondents.
No. A-2023-08T3
Superior Court of New Jersey, Appellate Division.
Submitted November 30, 2009.
Decided December 31, 2009.
*199 Coughlin Duffy, LLP, attorneys for appellant (Daniel F. Markham, New York, NY, of the New York bar, admitted pro hac vice, of counsel and on the brief; Deborah A. Kelly, Morristown, on the brief).
Daly, Lamastra & Cunningham, attorneys for respondent Oleg Rivkin (Olivier J. Kirmser, Warren, on the brief).
White and Williams, LLP, attorneys for respondent Richard I. Scharlat (Michael O. Kassak, Cherry Hill, of counsel and on the brief; Kim Kocher, Philadelphia, PA, on the brief).
Bashwiner and Deer, LLC, attorneys for respondent Gabrielle Tito (Joseph A. Deer, on the brief).
Law Offices of Bruce Egert, Jonathan S. Konovitch (Moskowitz Book & Walsh, LLP) of the New York bar, admitted pro hac vice, and Chaim B. Book, New York, NY (Moskowitz Book & Walsh, LLP) of the New York bar, admitted pro hac vice, attorneys for respondent The Jewish Press, Inc., join in the briefs of respondents *200 Richard Scharlat, Gabrielle Tito and Oleg Rivkin.
Respondents Zalman Levine, Rachelle Mandelbaum and Allan Cohen have not filed a brief.
Before Judges BAXTER, ALVAREZ and COBURN.
The opinion of the court was delivered by
BAXTER, J.A.D.
Plaintiff Yaakov Abdelhak appeals from a Law Division order that dismissed his defamation complaint against defendants, The Jewish Press, Inc., Oleg Rivkin, Richard Scharlat and Gabrielle Tito, for lack of subject matter jurisdiction, pursuant to Rule 4:6-2(a). The judge concluded that plaintiff's claims could not be resolved without excessive entanglement by the court and jury in issues of religious doctrine and practice. Plaintiff asserts that because the Law Division focused on numerous factual issues that were irrelevant to the resolution of his defamation complaint, the judge erroneously concluded that his claim could not be resolved by applying neutral principles of law. We reject plaintiff's contention that when a cause of action is secular in nature, and the defendants are not religious figures, there can be no excessive entanglement. Where, as here, a jury cannot evaluate plaintiff's cause of action without developing a keen understanding of religious doctrine, and without applying such religious doctrine to the facts presented, the excessive entanglement that the First Amendment seeks to avoid is squarely presented. Thus, we conclude that neither the secular nature of the cause of action nor the secular professions of the defendants serve as a per se bar to a finding of a lack of subject matter jurisdiction. We affirm.

I.
Plaintiff is a physician specializing in high risk obstetrics, whose patients are, almost without exception, women of the Orthodox Jewish faith. Plaintiff is a practicing Orthodox Jew and was raised as such by his parents. Plaintiff's father was an ordained Orthodox rabbi.
In August 2004, defendant Tito, who was plaintiff's wife, instituted divorce proceedings and informed him that she would seek custody of their two daughters and did not intend to honor her earlier promise to raise the children as Orthodox Jews. Although Tito had renounced the tenets of Orthodox Judaism, she nonetheless demanded that plaintiff provide her with a Get, which is a religious divorce granted by a husband to a wife. Unless granted a Get, an observant Orthodox Jewish woman is not free to marry again; a civil divorce is not sufficient. Moreover, children born of any subsequent marriage are deemed to have been born out of wedlock and bear a considerable stigma among Orthodox Jews. Based on advice and counsel purportedly issued to plaintiff by his spiritual adviser, Rabbi Rudinsky, plaintiff took the position that so long as Tito continued to refuse to raise their children in the Orthodox tradition, he was not obliged to grant her a Get.
While the divorce proceedings were pending in the Family Part, plaintiff's and Tito's rabbi, Aharon Ciment, of Congregation Arzei Darom in Teaneck, provided testimony at a deposition that was favorable to Tito. Rabbi Ciment's deposition testimony caused a deep schism in the congregation, with some congregants supporting him and others, including plaintiff, insisting that Ciment's contract not be renewed.
Defendants Rivkin and Scharlat became ardent supporters of Ciment. At a meeting *201 of several members of the congregation that Rivkin hosted, he and Scharlat vowed to "destroy [plaintiff] socially and professionally" unless plaintiff ceased his criticism of Ciment. Rivkin also commented he would see to it that plaintiff would never be able to remarry, promising to send letters to the Orthodox community stating that plaintiff was unworthy and attacking his character. Rivkin's and Scharlat's antipathy to plaintiff grew so intense that the Temple's board of directors was forced to convene a special meeting in December 2005 to "formulate the Board's response to a campaign that is going on to slander [plaintiff]." Ultimately, the Board requested Rivkin to cease "his methodical campaign of lashon harah[1] against [plaintiff]."
Rather than refrain from further activity, as the Board had requested, Rivkin, as well as Scharlat, intensified their involvement in the dispute between plaintiff and defendant Tito over whether plaintiff would provide her with a Get absent her agreement to raise their children as Orthodox Jews. On January 12, 2006, they presented the Board with a "Confidential Memorandum" requesting that the Board discuss "the continuing refusal by [plaintiff] to give a Get to his wife ... despite her repeated requests." Defendants Rivkin and Scharlat further asked the Board to "consider the implications of this continuing refusal ... in connection with [plaintiff's] continuing rights and status as a member of this congregation." Defendant Rivkin also initiated a conversation with defendant Tito's divorce attorney, in which he discussed possible witnesses. For his part, defendant Scharlat contacted Rabbi Rudinsky in an attempt to verify whether the Rabbi had, as plaintiff claimed, advised plaintiff that defendant Tito's repudiation of Orthodox Judaism justified plaintiff's refusal to provide a Get.
As a result of plaintiff's resistance to providing defendant Tito a Get, she instituted a proceeding before the Bais Din[2] of America (BDA). By its ruling of July 28, 2006, the BDA ordered plaintiff to "give a Get immediately" and "without delay."
Shortly thereafter, defendant Tito contacted The Jewish Press, a newspaper that bills itself as the "largest independent weekly Jewish newspaper in the United States." The Jewish Press champions the cause of women whose husbands refuse to provide a Get by listing such men's names on its Seruv list.[3] The Seruv list is designed to publicly shame such recalcitrant husbands into providing the requested Get.
Upon being notified by defendant Tito that plaintiff was in contempt of the Bais Din for his refusal to provide her a Get, The Jewish Press contacted the BDA to verify Tito's claim. Rather than seek written confirmation from the BDA, The Jewish Press telephoned the BDA and spoke to an unnamed staff member who confirmed, erroneously, that a Seruv order of *202 contempt had been issued, when in fact the BDA had merely directed plaintiff to provide the Get immediately.
Upon receiving the supposed confirmation that a Seruv had been issued, The Jewish Press, in its September 6, 2006 print edition, listed plaintiff's name in its regular column entitled "Seruv Listing." Specifically, the "Seruv Listing" falsely stated that a Seruv had been issued by the BDA against "Dr. Yaakov Abdelhak, of Teaneck, N.J." in August 2006. Of the ten individuals listed in the September 6, 2006 Seruv Listing in The Jewish Press, plaintiff was the only person whose professional title was included, even though one other doctor and a lawyer were also on the list.
Three days later, plaintiff was advised by Rabbi Rudinsky, for the first time, that he should provide defendant Tito with a Get. The next day, September 10, 2006, plaintiff did so.
On September 15, 2006, after plaintiff notified The Jewish Press of its error and advised the newspaper that no Seruv had been issued against him, The Jewish Press issued a retraction in its print version on September 15, 2006, blaming the error on misinformation provided by the BDA. The retraction notice added that "we also note that on Sunday, September 10, 2006, Dr. Abdelhak gave his wife a Get".[4]
On November 29, 2006, plaintiff filed a nine-count complaint in the Law Division against The Jewish Press, Rivkin, Scharlat and Tito alleging defamation, invasion of privacy, and intentional infliction of emotional distress arising from their roles in the false Seruv Listing published by The Jewish Press on September 6, 2006.
As a result of plaintiff filing a complaint and seeking a remedy in a secular court, a different Bais Din, the Mechon L'Hoyroa (MLH), issued a Seruv against plaintiff on March 13, 2008 for refusing to resolve his grievance against Scharlat, an Orthodox Jew, in the Bais Din "after [receiving] several summonses" issued on Scharlat's behalf by that religious body. The Seruv labeled plaintiff a "Mesarev Lavo L'Din" because his "conduct violate[ed] Jewish law" by "willfully declinin[g] to appear in front of Jewish courts." The Seruv document commanded the Orthodox Jewish community to "treat[ ] [plaintiff] in the manner specified by Rabbi Moshe Isserless (Rama) in Shulchan Aruch Choshen Mishpat 26:1." The March 13, 2008 Seruv has never been rescinded or withdrawn.
In October 2008, all defendants filed motions to dismiss for lack of subject matter jurisdiction, asserting that the resolution of plaintiff's complaint would entail excessive entanglement of the court into religious affairs and practices. On November 7, 2008, after oral argument, Judge Miller rendered a lengthy decision, supplemented by a written opinion, granting defendants' motions to dismiss. A confirming order was issued the same day.
In particular, the judge observed that the proofs to be presented by plaintiff at trial must be examined to determine whether the jury's task
would require excessive procedural or substantive interference with church operations. If the answer to either of these inquiries is in the affirmative, then the dispute is truly of a religious nature, rather than theoretically and tangentially touching upon religion, and the claim is barred from secular court review.
Judge Miller found that adjudication of plaintiff's claims would require the court and jury to make no less than eleven determinations *203 regarding questions grounded in religious doctrine:
1. the nature of a Seruv
2. whether [plaintiff's] indifference to the MLH Seruv indicates that it does not hurt his reputation in the eyes of Jews.
3. the difference in the alleged damage to [plaintiff's] reputation being called a Mesarev Ledin by the MLH as compared to the BDA.
4. the effect of being classified as a Mesarev Ledin.
5. whether the publication of [plaintiff's] name in the Seruv Listing made the followers of Orthodox Judaism in his community shun him socially and professionally.
6. whether Jewish women are not comfortable using a male obstetrician who is not married.
7. the significance of a husband withholding or giving a Get.
8. was the plaintiff justified in withholding a Get from defendant Ms. Tito.
9. whether Scharlat was justified in forwarding the Beth Din of America's July 28, 2006 letter decision to the Jewish Press.
10. whether plaintiff withholding and later giving the Get involves a matter of legitimate interest within the Orthodox Jewish community.
11. would a reasonable observant Orthodox Jew experience extreme emotional distress as a result of his name being included in a Seruv.
The judge reasoned:
[A]lthough plaintiff has purportedly asserted claims secular in nature, the adjudication of such claims would require this [c]ourt to determine issues of religious doctrine in violation of the Establishment Clause....
. . . .
Specifically, for the defamation claims, the [c]ourt would be required to ascertain the difference between the MLH Seruv and the initial Jewish Press Seruv listing and how such are considered within the Orthodox Jewish community.... [T]he case is similar to Klagsbrun [v. Va'ad Harabonim of Greater Monsey, 53 F.Supp.2d 732 (D.N.J.1999), aff'd, 263 F.3d 158 (3d Cir.2001) ], in that plaintiff's claims ... are all rooted in claims of plaintiff that deal with religious shunning as a result of a Seruv.... The Orthodox Jewish community is a closed community and claims and remedies are rooted on pronouncements within that community as reflected by the Bais Din, and grounded in religious doctrine and having a defined meaning only within the Orthodox Jewish faith.
Likewise, the invasion of privacy claims would also require this Court to engage in an analysis of how a Seruv listing is viewed within the Jewish faith and whether it would be considered "highly offensive to a reasonable person," here members of the Orthodox Jewish community, to be accused of withholding a Get.

. . . .
While there are no shortage of Rabbis for a Court and jury, the need for such shows the excessive entanglement of the "core ecclesiastical issues" in this case which requires the Court to dismiss under the Establishment Clause. Moreover, the court also notes that a determination of why the plaintiff's medical practice allegedly was damaged may rest not only on the issue of the Seruv listing, but also the fact that plaintiff is an unmarried man, with an exclusive clientele for Orthodox Jewish women, from an Orthodox Jewish community, and their mores.

*204 Consequently, only through excessive entanglement with the Jewish faith, doctrine and practice would such a determination be possible. Such a determination is inherently religious, and while there may be some secular ramifications in this ecclesiastical matter, as there are in most ecclesiastical matters, the "heart" or core of plaintiff's dispute is inherently religious in nature. The "get" and the rationale of withholding such on religious grounds, even the consequences of the purported "legitimate second Seruv," as well as the claims and remedies are all inextricably meshed in the Jewish faith, doctrine and practice.
[ (internal citations omitted) (paragraph breaks added).]
On appeal, plaintiff maintains that the Law Division's dismissal of his complaint was error because, contrary to Judge Miller's conclusions, plaintiff's cause of action can be adjudicated by applying neutral principles of law and without excessive entanglement in religious doctrine and practices. In particular, he argues the Law Division's opinion focuses on issues "irrelevant to the resolution of [his] claims." He maintains that the judge wrongly focused on the issue of the "`significance of a husband withholding or giving a Get' and the nature of a Seruv." He argues that by focusing on such issues, the judge "bought into the defendants' attempt to confuse the issues and create new irrelevant issues."
He also observes that because The Jewish Press has conceded that a Seruv was never issued against him, the listing was therefore false, and thus the only issue that requires resolution in relation to his claim for damages is whether "such inclusion was defamatory." Such factual determination, he argues, does not require the court to consult or become entangled in religious doctrine because his claims "are not predicated on a religious institution's procedures and decisions."

II.
The Establishment Clause of the United States Constitution "prohibits states from promoting religion or becoming too entangled in religious affairs." McKelvey v. Pierce, 173 N.J. 26, 40, 800 A.2d 840 (2002). "[T]he threshold inquiry is whether the underlying dispute is a secular one, capable of review by a civil court, or an ecclesiastical one about `discipline, faith, internal organization, or ecclesiastical rule, custom or law.'" Id. at 45, 800 A.2d 840 (quoting Bell v. Presbyterian Church (U.S.A.), 126 F.3d 328, 331 (4th Cir.1997)). When adjudicating the merits of a claim requires a court to interpret any one of these religious tenets, the court must abstain for lack of subject matter jurisdiction. Id. at 52, 800 A.2d 840.
"If, however, the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion ..., there is no First Amendment shield to litigation." Ibid. Neutral principles "are wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations." Elmora Hebrew Ctr., Inc. v. Fishman, 125 N.J. 404, 414-15, 593 A.2d 725 (1991). Under the neutral principles approach, the judiciary may resolve civil disputes between a religious body and its members if those disputes involve purely secular issues and can be resolved without the judiciary becoming enmeshed in matters of faith or doctrine. Id. at 415-16, 593 A.2d 725.
As the Court observed in McKelvey, relying on United States Supreme Court precedent, "`[n]ot all entanglements... have the effect of advancing or inhibiting *205 religion. Interaction between church and state is inevitable, ... and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause.'" McKelvey, supra, 173 N.J. at 43, 800 A.2d 840 (quoting Agostini v. Felton, 521 U.S. 203, 233, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391, 420 (1997)).
In McKelvey, the Court was presented with the Law Division's dismissal of the complaint filed by a former Roman Catholic seminarian who had sued the Diocese of Camden and a number of its priests, in contract and tort, claiming that he had been subjected to unwanted homosexual advances during his seminary training. Id. at 32, 800 A.2d 840. The Law Division had dismissed the plaintiff's complaint on the ground that adjudicating it would require intrusion into church "polity and administration," thereby excessively entangling church and state. Ibid.
The Court reversed the dismissal of the plaintiff's complaint, holding that "[t]he First Amendment does not immunize every legal claim against a religious institution and its members. The analysis in each case is fact-sensitive and claim specific, requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement." Id. at 32-33, 800 A.2d 840. Finding that the Law Division and Appellate Division had each "failed to engage in that kind of painstaking analysis" and had "painted with too broad a brush when dismissing [the plaintiff's] case," the Court reversed and remanded to the trial court for further proceedings. Id. at 33, 800 A.2d 840.
The Court reasoned that the plaintiff could satisfy the elements of a breach of fiduciary duty without implicating ecclesiastical policy merely by demonstrating that his spiritual director at the seminary was a person to whom a seminarian, such as the plaintiff, would naturally be expected to turn for counseling and guidance and that, by his indifference to the plaintiff's complaints of homosexual advances, the spiritual advisor had violated the duty of trust implicit in that supervisory relationship. Id. at 57, 800 A.2d 840. The Court held that those claims of hierarchy and duty were not peculiar to church institutions or religious doctrine and therefore the dismissal of the plaintiff's complaint was error. Id. at 58, 800 A.2d 840. Plaintiff essentially makes the same claim here, maintaining that a jury need not concern itself with the nature of a Seruv or become excessively entangled in the consequences of the issuance of a Seruv, but need confine its findings of fact to whether the false publication of a Seruv in The Jewish Press had defamed him.
To place plaintiff's arguments into a proper analytical perspective, we turn to a review of the applicable precedents and begin with opinions in which the court in question concluded that deciding the dispute would not result in excessive entanglement in religious affairs. Such opinions include Agostini, supra, 521 U.S. at 233, 117 S.Ct. at 2015, 138 L.Ed.2d at 420 (program under which a public school sent public school teachers into parochial schools during regular school hours to provide remedial education not violative of the Establishment Clause); Bowen v. Kendrick, 487 U.S. 589, 615-17, 108 S.Ct. 2562, 2577-79, 101 L.Ed.2d 520, 544-46 (1988) (finding no excessive entanglement in religion resulted from the Department of Health and Human Services' monitoring of federal grants to private organizations that provided counseling in the area of premarital adolescent sexual relations and pregnancy, even when the grantee was a religious organization, because the federal financial aid did not have the primary effect of advancing religion); Roemer v. Bd. *206 of Pub. Works of Md., 426 U.S. 736, 764-65, 96 S.Ct. 2337, 2353-54, 49 L.Ed.2d 179, 197-99 (1976) (finding no excessive entanglement in state oversight that was designed to ensure that categorical state grants to religious colleges are not used to teach religion); Welter v. Seton Hall Univ., 128 N.J. 279, 300-01, 608 A.2d 206 (1992) (permitting civil adjudication of nuns' complaint against Catholic university as the nuns' breach of contract action for termination of their employment as teachers of computer science did not arise from their performance of religious duties and the parties did not contemplate that religious canons would govern their contractual relationship); Elmora, supra, 125 N.J. at 416-17, 593 A.2d 725 (finding courts can enforce secular contract rights, but holding synagogue had consented to submission of its dispute against its rabbi to a rabbinical court and was thus bound by its decision); Menorah Chapels at Millburn v. Needle, 386 N.J.Super. 100, 108-10, 899 A.2d 316 (App.Div.2006) (finding that Establishment Clause did not prevent court involvement in a contractual dispute between an Orthodox Jewish funeral home and the family of the deceased over the non-performance of promised religious funeral services because the dispute did not concern the manner in which such services were performed, but solely whether they were performed at all). As is evident from each of these opinions, abstention was not required because a court and jury would be able to resolve the disputed question without being required to understand tenets of religious doctrine or practice.
In contrast, courts have not hesitated to invoke the doctrine of abstention where excessive entanglement would have resulted from maintaining the dispute in the courts. See Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 698, 96 S.Ct. 2372, 2375, 49 L.Ed.2d 151, 156 (1976) (finding that the court should refrain from deciding whether the Mother Church violated the procedural and substantive rights of a Bishop when it removed him from his position as a result of parishioners' complaints about his fitness to serve as a Bishop and his administration of the Diocese); Lemon v. Kurtzman, 403 U.S. 602, 622-24, 91 S.Ct. 2105, 2115-16, 29 L.Ed.2d 745, 761-62 (1971) (invalidating two state statutes authorizing state financial aid directly to church-related schools because implementation of the program required determination by state officials of whether the courses receiving the financial subsidy were secular or religious); Klagsbrun v. Va'ad Harabonim of Greater Monsey, 53 F.Supp.2d 732, 741-42 (D.N.J.1999) (abstention proper where plaintiff sued for defamation arising from a flyer circulated after the plaintiff had refused to follow an order of a Bais Din that he grant his wife a Get), aff'd, 263 F.3d 158 (3d Cir.2001); Ran-Dav's County Kosher, Inc. v. State, 129 N.J. 141, 162-63, 608 A.2d 1353 (1992) (promulgation of Kosher food regulations violated Establishment Clause because disputes regarding interpretation of those regulations would inevitably entail application of Jewish law), cert. denied, Nat'l Jewish Comm'n on Law & Pub. Affairs v. Ran-Dav's County Kosher, Inc., 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993); and Sabatino v. St. Aloysius Parish, 288 N.J.Super. 233, 237, 672 A.2d 217 (App. Div.1996) (concluding that the position of principal in a parochial school is religious in nature and that selection of a new principal by the Diocese was an ecclesiastical decision necessitating judicial abstention).
Thus, we must decide whether, as in Roemer, Agostini, Bowen, Welter, Elmora, and Menorah Chapels, plaintiff's claims can be decided by the application of neutral principles of law, or, whether, as in Lemon, Serbian Eastern, Klagsbrun, Sabatino, *207 and Ran-Dav's, abstention is required. We turn to an analysis of each of plaintiff's three causes of action, starting with his defamation claim.

III.
"A defamatory statement is one that is false and `injurious to the reputation of another' or exposes another person to `hatred, contempt or ridicule' or subjects another person to `a loss of the good will and confidence' in which he or she is held by others." Romaine v. Kallinger, 109 N.J. 282, 289, 537 A.2d 284 (1988) (quoting Leers v. Green, 24 N.J. 239, 251, 131 A.2d 781 (1957)). To prevail on a defamation claim, a plaintiff must prove, in addition to damages, that the defendant made a false statement of fact about the plaintiff, while either knowing that the statement was false or failing to exercise due care to ascertain the truth or falsity of the statement; the defendant communicated the false statement to a person other than the plaintiff; and the statement at issue had the capacity to injure the plaintiff's reputation. Feggans v. Billington, 291 N.J.Super. 382, 391, 677 A.2d 771 (App.Div.1996).
As we understand the record, defendants do not, at least for the purposes of their motion to dismiss, seriously dispute plaintiff's claim that the Seruv Listing was false, that it was communicated to others, and that the exercise of due care would have established its falsity. They confine their arguments to the claim that the other prongs of a defamation claim cannot be resolved without excessive entanglement by a court and jury into issues of religious practice and doctrine. They maintain that a secular jury cannot possibly determine whether the false Seruv Listing casts plaintiff in an unfavorable light without probing deeply into the customs, traditions and rules of Orthodox Judaism.
Unquestionably, a statement that is false is not actionable unless it also injures the plaintiff's reputation. Ibid. Therefore, to evaluate whether plaintiff's reputation suffered any injury, a jury would, of necessity, be required to determine how a Seruv Listing is viewed within the Orthodox Jewish community and whether an Orthodox Jew would be offended by another's refusal to provide a Get. To make that determination, a jury would be obliged to consider the intricacies of Jewish doctrine. Such consideration would require a jury to delve deeply into the importance of giving a Get and the disdain heaped on a man who refuses one. Each of the following matters is without analog in civil affairs, and cannot be understood by a jury without a deep understanding of Orthodox Jewish tradition: the consequences to a wife of a husband's refusal to give a Get; her inability to remarry in the Orthodox faith without a Get; the effect of a remarriage without a Get on any future children; whether Orthodox Jewish husbands are obliged to provide a Get; and whether being accused of withholding a Get exposes an Orthodox Jewish man, such as plaintiff, to ridicule, shame or opprobrium within the Orthodox community. Unless a jury evaluates these deeply religious questionsthat are limited to the practices and doctrine of the insular Orthodox Jewish communitythe jury would be unable to perform the threshold task of deciding whether the false Seruv Listing was even defamatory at all.
We reject plaintiff's claim that because a jury need determine only whether the false Seruv Listing "exposed him to hatred, contempt or ridicule or subjected him to a loss of good will and the confidence of others," the jury need make no inquiry into Jewish doctrine. No jury could possibly determine such questions without a deep understanding of the Orthodox Jewish *208 practices and traditions to which we have just referred. Thus, the threshold issue of whether the statement was defamatory would entangle a jury excessively in religious questions.
Moreover, it is not merely whether the false Seruv Listing cast plaintiff in a shameful light that the jury will be required to determine. If that question were to be answered in the affirmative, the jury would be required to consider an award of damages. No doubt plaintiff will present evidence concerning the decline in his medical practice as an element of damages. That evidence, like the threshold issue of defamation, requires a deep understanding of Orthodox Jewish practices and traditions.
As Judge Miller correctly observed, no jury could determine how much of the decline in plaintiff's income resulted from the defamatory Seruv Listing, and how much of the decline resulted from other factors, unless the jury immersed itself in Orthodox Jewish beliefs. In particular, to award damages, the jury would be required to differentiate between the income loss attributable to the false Seruv Listing and the income loss caused by any one of a number of other religiously-based causes: 1) the MHA Seruv, still in existence, issued for plaintiff's refusal to honor the MHA Bais Din summons; 2) the reluctance of Orthodox Jewish women to be examined and treated by an unmarried male; 3) plaintiff's disregard of the Bais Din's July 28, 2006 directive to provide the Get "immediately"; and 4) his refusal until September 10, 2006 to provide the Get at all. To parse these alternative causes of plaintiff's drop in income, in a way that excludes these four other possible causes and focuses solely on the false Seruv Listing, would require the jury to determine what portion of plaintiff's monetary loss was attributable to the false Seruv Listing and what portion to the other four possible causes. Such conclusions could not be drawn unless, again, the jury were to develop a keen understanding of how an Orthodox Jew would view each such event. Such an undertaking exemplifies the excessive involvement in matters of "faith... or ecclesiastical ... custom" that the Court prohibited in McKelvey. Supra, 173 N.J. at 45, 800 A.2d 840 (internal quotations omitted).
An award of damages would also, of necessity, require a jury to place a monetary value on the shame and ostracism experienced by a person named in a Seruv Listing. Again, lay jurors, ignorant of the culture, practices and tenets of Orthodox Judaism, have no background or experience that would enable them to measure the suffering of a person who is falsely cast in the light of a mesarev ledin, a person disgraced in the eyes of his own community. Awarding damages for this type of injury could not be accomplished by the application of "neutral principles of law," id. at 48, 800 A.2d 840, and would necessitate "excessive entanglement," id. at 43, 800 A.2d 840, in matters of doctrine and faith.
Indeed, these same considerations led the United States District Court in Klagsbrun to dismiss the plaintiff's complaint on excessive entanglement grounds, supra, 53 F.Supp.2d at 741-42, and the Third Circuit to affirm, 263 F.3d 158. The facts there were strikingly similar. The plaintiff in Klagsbrun was a man of the Orthodox Jewish faith[5] accused by a board of Rabbis *209 of refusing to give his wife a Get after being ordered to do so.[6] 53 F.Supp.2d at 735-36. To resolve the plaintiffs' defamation claims, the District Court was required to decide whether, as the male plaintiff claimed, he had received rabbinical permission to remarry, or whether as the defendants claimed, he had not, and was therefore a bigamist in the eyes of Orthodox Judaism. Ibid.
Judge Ackerman held that determining the truth or falsity of the plaintiffs' defamation claim would require the court to "delve dangerously into questions of doctrine and faith," id. at 739, because the resolution of such claims would "require[ ] evaluat[ion of] whether failure to comply with an order of a rabbinical court or failure to submit to the jurisdiction of a rabbinical court are wrongs or sins within the Orthodox Jewish faith which lead to the imposition of the punishment of shunning." Id. at 741. Of additional concern was the need to "inquire into the rules and customs governing rabbinical courts." Id. at 741-42.
In reaching the conclusion that the plaintiffs' "entire defamation claim ... is grounded upon religious doctrine," the court rejected their claim that "this court would not be required to resolve competing theological propositions" because the court "need only resolve factual questions of (1) whether Seymour Klagsbrun engaged in bigamy; (2) whether a rabbinical court had ordered Seymour Klagsbrun to give [his ex-wife] a [G]et; and (3) whether Seymour Klagsbrun has refused to submit to the jurisdiction of a rabbinical court." Id. at 742.
Rejecting that line of reasoning as "unpersuasive," Judge Ackerman reasoned that:
The important point here is that resolution of the factual disputes would require this court to inquire into religious doctrine and practice. Simply because, for example, the question of whether Seymour Klagsbrun actually engaged in bigamy is factual in nature, in no way diminishes the need for this court to delve into religious doctrine. As noted above, the issue, using just one example, is whether Seymour Klagsbrun engaged in bigamy within the meaning of the Orthodox Jewish faith, which by its very nature necessitates an inquiry into religious doctrine. Also unpersuasive is the apparent premise of the plaintiffs' argument, that there must be "competing theological propositions" before the First Amendment is implicated. Rather, the Establishment Clause is implicated whenever courts must interpret, evaluate, or apply underlying religious doctrine to resolve disputes involving religious organizations.
[Ibid.]
As in Klagsbrun, the resolution of plaintiff's defamation claim here would require a court and jury "to delve into religious doctrine," ibid., because the jury would be faced with evaluating whether a claim that plaintiff had refused to provide his wife a Get would expose him to shame and condemnation within the Orthodox Jewish community. Apparently recognizing that the reasoning of Klagsbrun, if applied here, would be harmful to his position, plaintiff seeks to distinguish Klagsbrun on its facts. He contends that:
First, ... there are no issues that require the lower court to inquire into the nature of the Get and under what circumstances it may or may not be given. *210 ... Second, none of the defendants in this case are Rabbis. Third, unlike in Klagsbrun, the defamatory statement here was not a notice or decree from a Rabbi but a full newspaper article. Fourth, this case involves issues other than defamation, such as invasion of privacy and intentional infliction of emotional distress, which require their own separate First Amendment analysis.
Addressing those contentions in that order, we have already rejected his first claim and need not discuss it further. As to the second, we do not view the profession of the defendants as central in any way to the court's analysis in Klagsbrun, because the court focused on the application of religious doctrine as the basis for abstention, not the profession of the defendants. As to plaintiff's third argument, we conclude that the forum in which the defamatory statement was issued is not a factor that requires a different result from that reached in Klagsbrun, because regardless of the forum, the dispute in question cannot be resolved without "delv[ing] dangerously into questions of doctrine and faith." Id. at 739. As to plaintiff's fourth argument, we agree that each cause of action requires separate analysis, but this is not a basis for distinguishing Klagsbrun. It merely requires us to explore plaintiff's two other causes of action separately, which we proceed to do shortly.
Implicit in plaintiff's argument that he is entitled to reversal is a contention that when a cause of action is secular in nature, and the defendants are not religious figures, there can be no excessive entanglement. We disagree. Where, as here, a jury cannot evaluate plaintiff's defamation claim without developing a keen understanding of religious doctrine, and without applying such religious doctrine in a fact-sensitive and nuanced fashion, the excessive entanglement that the Founders sought to avoid is squarely presented. Thus, we conclude that neither the secular nature of the cause of action nor the secular professions of the defendants serve as a per se bar to a finding of a lack of subject matter jurisdiction.
In sum, as to plaintiff's defamation claim, we conclude, for the same reasons expressed by Judge Miller in the Law Division, and by Judge Ackerman and the Third Circuit in Klagsbrun, that plaintiff's defamation claim cannot be resolved by the application of "neutral principles" of law but instead inevitably requires the application of religious doctrine, practices and belief that the First Amendment forbids.

IV.
The elements of a claim for intentional infliction of emotional distress require a plaintiff to prove that the defendant acted intentionally or recklessly; the conduct was extreme and outrageous; the defendant's actions were a proximate cause of the plaintiff's emotional distress; and the emotional distress suffered by the plaintiff was "`so severe that no reasonable man could be expected to endure it.'" Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988) (quoting Restatement (Second) of Torts, § 46 comment j).
The first and third elements of such cause of action are susceptible to resolution without the application of religious doctrine; however, we conclude that no jury could evaluate whether the conduct was "extreme and outrageous," or whether the conduct caused plaintiff to suffer "severe" emotional distress, without understanding whether the accusation made in The Jewish Press, when it falsely included plaintiff's name in its Seruv Listing, would be viewed as "extreme and outrageous," within the Orthodox Jewish community. *211 Nor could a secular jury determine whether such a false Seruv Listing would cause a person of that faith to suffer "severe" emotional distress.
So viewed, plaintiff's intentional infliction of emotional distress claim suffers from the same excessive entanglement obstacles as does his defamation claim. For that reason, we reject as meritless his contention that Judge Miller's dismissal of his intentional infliction of emotional distress claim was error.

V.
Last, we address plaintiff's claim that Judge Miller wrongly dismissed his cause of action for invasion of privacy/false light. To prevail on such claim, a plaintiff must demonstrate that a defendant interfered with the plaintiff's right to be left alone, and did so by portraying him in a false light in the public eye. Such depiction of a plaintiff "need not be defamatory, but must be something that would be objectionable to the ordinary reasonable person." Rumbauskas v. Cantor, 138 N.J. 173, 180, 649 A.2d 853 (1994). We need not tarry long on discussion of this claim because, like plaintiff's two other causes of action, a jury could not resolve this one without "delving dangerously" into issues of religious doctrine. A jury could not determine whether the accusation of withholding a Get would be objectionable to a person of the Orthodox Jewish faith without analyzing tenets of Orthodox Jewish doctrine. For that reason, this claim, like the other two, was properly dismissed on abstention grounds.

VI.
In affirming the dismissal of all of plaintiff's claims, we are not unmindful of the consequences of such dismissal. The right to maintain one's "good name, unimpaired" has its roots in "the essential dignity and worth of every human beinga concept at the root of any decent system of ordered liberty." Senna v. Florimont, 196 N.J. 469, 479, 958 A.2d 427 (2008) (internal citations and quotations omitted). Thus, any order that prevents a plaintiff from pursuing what may well be a meritorious claim for the destruction of his good name imposes a harsh consequence on a plaintiff. However, as Judge Ackerman aptly observed in Klagsbrun, "First Amendment jurisprudence has traditionally `called for line drawing' by the courts to best effectuate its rather lofty goals." Klagsbrun, supra, 53 F.Supp.2d at 737 (quoting Lynch v. Donnelly, 465 U.S. 668, 678, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604, 613 (1984)). We are forced here to set the boundary between the secular and the ecclesiastical and, in our view, because plaintiff's claims cannot be resolved without excessive entanglement into religious beliefs, we are left with no alternative other than the dismissal of plaintiff's claims.
Affirmed.
NOTES
[1] This Hebrew term translates as "using insults."
[2] Also known as a Beth Din or a Beit Din, the Bais Din is a rabbinical court composed of a minimum of three rabbis who are authorized to pass upon questions of Jewish law and practice presented to them.
[3] A Seruv is an order of contempt issued by a Bais Din, a rabbinical court, to a husband who refuses to comply with the order of the Bais Din to give his wife a Get. A person issued a Seruv is known as a mesarev ledin. Such person must be shunned by all Orthodox Jews. He is also forbidden from reading the Torah aloud during religious ceremonies, from being called to the pulpit as an honor, from participating in any form of prayer gathering, and from being buried in an Orthodox Jewish cemetery.

The word Seruv is spelled alternately in the record as Siruv.
[4] The Jewish Press also published a retraction on its website. The retraction did not include the announcement contained in the print version that plaintiff had given his wife a Get.
[5] Unlike the present matter, the alleged defamation included an accusation that plaintiff had defied the Rabbis' order to reveal the name of the Rabbi who had supposedly issued him and his ex-wife a Get. That additional fact was not central to the District Court's reasoning.
[6] Klagsbrun's second wife was also a plaintiff because the allegation of bigamy affected her as well.